## McNABB et ux. v. DUGAS.
### No. 954.

Court of Appeal of Louisiana.   First Circuit.
June 8, 1932.

J. C. Hollingsworth, of New Orleans, for appellant.

Laycock & Moyse and J. Y. Sanders, Jr., all of Baton Rouge, for appellees.

### ELLIOTT, J.

Lee McNabb and Mrs. Cecil Smiley McNabb, his wife, sue to recover damages to Felix Dugas on account of an automobile collision in which the automobile belonging to the plaintiff Lee McNabb was demolished and Mrs. McNabb, his wife, was badly injured. The collision took place on the Amite river bridge. The Amite river at the place in question forms the eastern boundary limits of the parish of East Baton Rouge and the western limits of the parish of Livingston. The western half of the bridge is said to be in the parish of East Baton Rouge and the eastern half in the parish of Livingston.

Mrs. McNabb claims $25,000 for herself and in her own right on account of personal injuries sustained by her, and Mr. McNabb claims $1,533.55 on account of the loss of his automobile and his expenses resulting from the injury to, and medical treatment of, his wife. The occurrence took place on the Livingston parish side of the bridge at about the hour of 1:30 p. m. on March 15, 1930. The McNabb car, driven by Mr. McNabb, was a Ford touring car; that driven by the defendant Dugas was a Buick sedan. Mr. McNabb was seated on the left-hand side of the front seat of his car. Mrs. McNabb occupied the right-hand side of the front seat, Arthur Davis, Jr., and Tobe Richardson occupied the back seat. Mr. Dugas and a young lady companion were the only occupants of the Buick sedan; both were seated on the front seat, Mr. Dugas driving.

The plaintiffs allege that the collision was due to the excessive and terrific speed at which the defendant was driving on the bridge; that as defendant's car hit the bridge it started and continued swerving and careening violently from side to side on the bridge; that plaintiff's car was the first to reach and enter on the bridge; that plaintiff Lee McNabb, perceiving the extraordinary rate of speed of the approaching car, and that it was careening or swerving from side to side of the bridge, first drew his car over to the extreme right-hand side of the bridge, and slowed down to about six miles an hour; that, then becoming alarmed at the rapidity of the approaching and wildly careening car ahead, he drew to a stop on the extreme right-hand side of and on the Livingston or eastern end of the bridge, and waited the passage of the on-coming car, which continued its approach, swerving violently from side to side of the bridge, first struck with its front end the iron railing on its right-hand side, that being the southern or downstream side of the bridge, swinging around and reversing ends on the bridge, its rear end smashed into and completely demolished plaintiff's car, and seriously and permanently injured Mrs. McNabb.

Defendant denies liability to the plaintiff, the excessive speed alleged against him in driving upon and while on the bridge, and that the car driven by him struck the McNabb car. Further answering, he alleged that the car he was driving was the property of the state, and that he himself was at the time an employee of, and engaged in the business of, the state, and was therefore not liable to the plaintiff. He further alleged that, unknown to him, rain had fallen on the level top of the bridge, and that the bridge flooring, due to a composition with which it was covered, was thereby rendered slippery;

that he was driving at a legal rate of speed, but his car, due to the slippery condition of the bridge, skidded and swerved; that, knowing the application of brakes would merely cause additional slipping and swerving, he proceeded partially across the main span, where his car swerved from a direct line and came into contact with the steel uprights and supports of the bridge, which caused it to swerve in a semicircle toward the left, coming to a stop approximately at the place where it impacted with the bridge; that this impact with the bridge was not due to negligence on his part in driving, but to the slippery condition of the bridge caused by the rain, a fortuitous event, caused by the act of God, and for which he was not accountable; that, had it not been for the slippery condition of the bridge produced by rain, no collision or impact would have occurred between his automobile and that driven by the plaintiff; that the highway approach to the bridge structure concealed the water on the bridge from his view until he was so close to it that it was impossible to avoid it; that the plaintiffs Mr. and Mrs. McNabb, living in the neighborhood of the bridge, were aware of its condition.

Defendant further avers, and in an amended and supplemental answer more specifically and directly alleges, that the plaintiffs, on coming toward the bridge from the eastern side, saw the impact which had taken place between defendant's car and the downstream side of the bridge and where it had stopped, and had time to and should have avoided striking it; that plaintiffs' failure to stop or pass to the left of defendant's car constituted negligence on the part of the plaintiffs, and therefore, even if defendant was negligent as claimed by plaintiffs, which defendant denied, that plaintiffs were guilty of contributory negligence in the matter of the collision, and could not recover on that account.

There was judgment in the lower court in favor of Lee McNabb for $1,148.55 and in favor of Mrs. Cecil Smiley McNabb for $6,500. Defendant has appealed.

Mr. and Mrs. McNabb, Arthur Davis, Jr., and Tobe Richardson, occupants of the Ford car, all live in the neighborhood of Denham Springs and within a distance of about three miles from the bridge, and were no doubt reasonably well acquainted with it. The evidence does not show that they had ever crossed it when it was wet, but it is probable that Mr. McNabb has done so.

The defendant, although not living in the vicinity, had crossed the bridge a number of times during the year previous to the occurrence in question; had in fact crossed it twice a couple of days before the day on which the collision took place, but he testifies that he had never at any previous time crossed it when it was wet, and was unaware that it was made slippery as a result of rain. The total length of the bridge is about 400 feet. It inclines upward at each end; the length of the inclines from the ground to the level top are not definitely established, evidently about 75 feet, after which the top of the bridge is level for a distance which we estimate at about 175 or 200 feet.

In the highway, right at the foot of the western end of the bridge, there is a slight dip or elevation, we are unable to determine which, but, whether elevation or dip, the effect is the same. An automobile passing over it very fast bounds on its springs as it enters on the bridge, and on the present occasion, when defendant passed over this place, his speed was such that his automobile bounded on its springs, but, if he had driven on the bridge at a prudent rate of speed, say 30 or 35 miles an hour, no bounding of any consequence would have taken place.

The bridge is a steel structure, made entirely of steel and iron, except the floor, which is covered with wooden planks, and these planks are covered over with some composition, the nature of which the evidence does not make clear. Defendant's automobile measured from the front end of the chassis to the rear of two tires carried on the back end 16 feet and 3 inches in length. The bridge, measured in between two wooden rails laid on the floor on each side, is 15 feet and 1½ inches in width. Measured in between the steel hand rails on each side it is 16 feet wide. The length of defendant's automobile being greater than the width of the bridge, it could not have turned itself diagonally across the bridge, if its front bumper had not been bent backwards as a result of the impact of its front end with the south side of the bridge, because, if its rear end, in swerving around, struck the northern side of the bridge, it was shown to have done so without causing noticeable damage to the car or to the bridge.

As for the contention urged by defendant that he is not liable in damages for the destruction of plaintiffs' automobile and the injuries sustained by them, on the ground that he was at the time an employee of, and driving an automobile belonging to, the state, on business of the state, the defense in our opinion is not good, even if it was true. But it is not necessary to act on the matter further than to say that it is our conclusion from defendant's evidence on the subject that, in making the trip in question, he was not engaged in the business of the state.

Defendant next contends that he drove on and reached the level of the bridge going at a legal rate of speed, but that the level top of the bridge was slick as a result of being wet from rain, of which fact he was unaware; that, the bridge being slick, his automobile was thereby caused to swerve and careen from side to side, which caused him to

lose control, and his car to run in an angling, southeastern course, the front end striking the south side of the bridge, which checked its forward movement, but its rear end, swerving ahead, projected itself over on the northern or upstream side of the bridge, with its front end facing west, its rear end east, in which position it came to a standstill about 31 feet east of the place where its front end had struck the south side of the bridge, and where it was struck by plaintiffs' car, after becoming still; that the position of his car at the time it stopped on the north side of the bridge was brought about as the result of a fortuitous event and for which he was not responsible; that it was an object which the plaintiffs saw and should have avoided, etc.

The defendant states in his testimony that he drove along the highway at times before reaching the bridge at between 60 and 65 miles an hour, but at the time he hit the bridge he was going anywhere between 30 and 40 miles an hour. It is a question in our mind whether in saying "when I hit the bridge" he has reference to the time when he came to and entered on the bridge, or to the striking of the south side of it after he had reached the level top and was proceeding to cross it. His testimony on that subject is as follows: "Q. When you struck the bridge you were going 45 miles an hour? A. No Sir, I believe I was going anywhere between 30 and 40. I don't believe I was going 45 miles an hour; if I had hit the bridge going 45 miles an hour the first skidding would have taken me into the rail of the bridge."

Understood either way, we come to the same ultimate conclusion concerning the speed of his car at the time it hit the southern side of the bridge.

A witness called by plaintiffs, apparently without interest either way, had stopped on the side of the road, say 25 or 30 feet west of the bridge and engaged in working on his car, testified that defendant passed him going toward the bridge at a speed which he estimated at about 60 or 75 miles an hour. This witness claims that he was looking at defendant when he passed him going toward the bridge, as he entered it and went forward until he struck the downstream side of the bridge, saw the rear end of his car swing around and strike the McNabb car coming on the bridge; that defendant put on his brakes before he got to the bridge, released them, put them on again, and, when he got on the bridge, went to skidding around; that the McNabb car was coming slowly on the bridge —appeared to be stopped. When he (we understand witness to be referring to defendant) got about 7 feet from the Livingston parish side, his car just swerved all the way around and hit this Ford car in the front with his rear end, the impact sounding like a crash.

Another witness called by plaintiff, apparently without interest either way, testifies that he was on the western side of the river, distant about 100 feet from the bridge, saw defendant when he entered the bridge, struck the southern side of it, and saw the rear end of his car swerve around and strike the front end of plaintiffs' car.

This witness says that defendant hit the bridge at full speed, threw on his brakes, and did not turn them loose until he hit the front end of the bridge. He hit the beams of the bridge, and his rear left bumper tore up Mr. McNabb's car, hit it in the front, the impact sounding like the bridge was falling, like everything there was torn up. In another place he says that "when defendant first hit the bridge he put on the brakes; that his car began to wabble and that defendant seemed to lose control of his car; that when the front end of his car hit the side of the bridge it turned his car completely around and in turning the rear end collided with the McNabb car."

Tobe Richardson, riding in the McNabb car, likely friendly to the plaintiff, states that the occurrence took place substantially as follows: "Just before we arrived at the Amite River bridge, on that hill I looked up and saw a car coming zig zagging. As it got near us Mr. Lee pulled to his right side; he was on his right side already and he stopped. When he stopped his car this Buick hit the corner of the post and whipped around just like that, (indicating) and the back end of the Buick knocked that Ford clear across." This witness at the request of defendant remained at the scene, and was there when everybody else had left, as we understand it, looking after defendant's car until the wrecker came and took it to Baton Rouge.

Arthur Davis, Jr., an occupant of the McNabb car, likely friendly to plaintiffs, states that the occurrence took place substantially as follows: "When we drove on the Amite River bridge Mr. McNabb says, look yonder! * * * I saw a Buick sliding from one side of the road to the other. Just before it got to us, it hit the side of the bridge and turned around on the bridge. The back end of the Buick slid into the front end of our car."

Asked about the motion of the McNabb car at the time it was struck, and his answer was: "Well, I could not say if it was stopped plum still, but the McNabb car was almost still if not dead still"; that the Buick, after hitting the bridge, turned completely around.

Mrs. McNabb, one of the plaintiffs, states the matter as follows: "Just as we went up on the bridge * * * my husband made the exclamation that caused me to look up. * * * As I looked up there was a car approaching; it was on the bridge when I saw

it, but it was the far end; I couldn't say how far on the bridge it was. It was moving from side to side just as it got to us. I don't know what happened to it, to cause it to turn around I couldn't say, but the last thing I remember is, the left rear end of the car coming right up in our path, where we had stopped our car and I heard a crash and explosion. * * * I do not know whether we were stopped or practically stopped at the time we were struck."

Mr. McNabb's version of the occurrence stated substantially is that he came up to the bridge going west, driving at about 20 or 25 miles an hour. That, when he got within 50 or 75 yards of the bridge, he saw the Dugas car coming around the bend on the other side, but did not conceive of the speed the car was running, that he (McNabb) reached the bridge first. "As I drove up on the bridge and reached the top of the approach on this end—(It was on the top of the approach that I said Look Yonder) I reached with my foot for my brake; at that moment Mr. Dugas' car made the first skid, which I judge to be the time he hit the fore end of the bridge. * * * Time passed mighty fast for just a second or two. I pulled my car to my right as close as I could reasonably pull it, not coming to a stop. The car Mr. Dugas was driving coming across the bridge swerving. As to how many times it swerved, I don't know, but at intervals. * * * When his car got within 100 feet of the east end of the bridge the front end of his car rammed the steel railing of the bridge on the down stream side and the left rear corner of his car hit the front end of my car, as best I can tell, after my car came to a stop. * * *" That the Dugas car did not turn completely around. That the rear end of defendant's car swung around and the left rear corner of defendant's car struck the front end of plaintiffs' car. The front end of Dugas' car left the railing and moved over to the left side of the bridge, and that left his car sitting right directly facing Baton Rouge. He subsequently repeated that the Dugas car had not turned completely around when it struck his car.

"Q. About how long after it struck the down stream side of the bridge was it before it collided with your car? A. May I indicate that to the court with a statement?

"Q. Yes, Sir. A. The rear end of the car did not check. The time between the instant the front end of the Buick hit the post and the rear end of the Buick hit my car was the time the rear end took to travel from where it was then. The front end hit the post, till it hit my car, which would have been that quick (striking his clenched hand three times on the table in front of him rapidly, indicating almost instantaneously)." It was agreed in the note of testimony at this place that the time indicated was less than half a second.

The young lady who was seated with Mr. Dugas on the front seat of the Buick, says she did not see the collision with plaintiffs' car. She was looking ahead of her in the direction she was going, and the impact with plaintiffs' car took place behind her; but she heard the impact and says that the impact with the bridge and that with plaintiffs' car was almost together.

Mr. Dugas testifies that he did not see the impact between his car and that of plaintiffs, because he, throughout the collision, remained with his face to the front, but he heard the impact behind him, and got out and went around to assist those in plaintiffs' car that were injured. He further testified:

"Q. The collision was between the rear end of your car and the front end of Mr. McNabb's car? A. Yes, Sir. I remember when we hit we were turned backward. That is our backs were turned to the McNabb car. I heard flying glass and felt that all the glass in my car was broken. I looked around and was surprised to see no glass broken. I looked back on my car and saw the Ford car behind me.

"Q. Your car struck the McNabb car? A. I am under the impression that both cars hit. My car was sliding backward on the wet surface of the bridge and Mr. McNabb's car was evidently coming forward at the time.

"Q. Why are you under that impression? A. My idea of it was because of the damage done to the Ford car and to the rear end of my car."

Defendant opposes the testimony of experts against the direct evidence produced by the plaintiffs.

An expert mechanic, who had repaired defendant's car, kept no written data as to its condition at the time; gave it as his opinion on the trial, which was about nine months afterwards, that the injuries it had received indicated that it had been struck in the center of the rear end at the time in question.

He then placed on the stand another expert having the weight and length of the Buick and the width of the bridge, but no other accurate data as a basis; gave it as his opinion that the Buick car had been struck in the rear by the Ford car.

The angle and velocity at which the Buick struck the south side of the bridge was computed from the appearance of the bridge where it had been struck. It was not admitted nor established. The coefficient of friction acted on for the purpose of determining the force of the pivotal movement of the rear end of the Buick after its front end had struck the bridge was not admitted nor established to have been equal to and in

conformity with that existing on the bridge and in harmony with its course and the action of its wheels at the time of its impact with plaintiffs' car.

The conclusion of the expert appears from the following question and answer:

"Q. Prof——— In your opinion then, was the Buick car moving in any direction at the time when it had reached 31 feet and 6 inches from the point of impact with that frame? A. It had ceased rotating but was rolling back toward the east end of the bridge with a velocity of 5.5 feet per second or 3 and ¾ miles per hour.

"Q. Then after it had ceased to rotate, what was the rate of speed in miles per hour at which this car was moving backward when it reached 31 feet 6 inches from the frame work of the bridge? A. 3 and ¾ miles per hour."

The plaintiff called an opposing expert, but comment on the opposing opinion will serve no useful purpose in the case.

Defendant, it seems, made a mark on the iron railing on the northern side of the bridge which he pointed out to his expert, and it is argued in behalf of the defendant that this mark indicates the place where the two cars impacted after the Buick had struck the south side of the bridge. The expert declares that the accuracy of his conclusion does not depend on whether this mark indicates the exact place where the two cars impacted. That may be true, but the testimony shows that the location of the mark to which the expert refers does have some bearing on his ultimate conclusion. But a more important matter is that it is his theory that the Buick at the time of its impact with the Ford was on the north side of the bridge, with its front end facing west and its rear end east, and there is direct testimony to the effect that, immediately following its impact with the Ford, it came to a standstill diagonally across the bridge, the front end farthest west and nearest to the south side of the bridge, the rear end further east and nearest to the north side of the bridge, a position from which it had to be removed in order that an automobile might pass on the south side of the bridge.

Mr. Dugas, speaking of the mark which he claims to have made, questioned by Mr. Hollingsworth, said: "Q. When you were being cross-examined at the beginning of this trial. * * * Will you kindly testify as to whether or not you placed any mark on the Amite River Bridge with reference to any particular part of your car as it stood after the accident was over? A. I did. The mark is on the bridge yet; I noticed it on the bridge this morning. I took a piece of iron, part of the debris spoken of, part of the rack for the extra tire and scratched three distinct marks on the railing on the upstream side of the bridge, just in a line with the rear end of my car, of the extra tire still on my car."

Subsequently questioned by Mr. Moyse:

"Q. You say you put three distinct marks on the rail of the bridge? A. Yes, Sir.

"Q. Which rail? A. On the upstream rail.

"Q. When did you do that? A. Just a few minutes before I got in the car and came toward Baton Rouge.

"Q. Who was present when you did that? A. The only man I know who was present was that fellow, that negro Tobe Richardson.

"Q. And what mark was put there? A. On the iron railing of the bridge, even with the back end of my automobile where it stopped."

Three witnesses, one of them apparently without interest in the matter either way, testified that the Buick automobile, when it came to a standstill immediately following the impact between it and plaintiffs' car, was lying diagonally across the bridge, its front end further west than its rear end; its front end closer to the south than to the northern side of the bridge. It was in such a position that traffic could not pass, and Mr. McNabb and several other men shoved it over to the north side of the bridge, so that other automobiles could get by on the south side of the bridge. Mr. McNabb, supported by Messrs. Barnett and Davis, gives the position of the Buick immediately after its impact with plaintiffs' car as follows:

"Q. Mr. McNabb, what was the position of the Buick, if you recall it, immediately after the wreck? A. The Buick, immediately after the wreck, was setting at approximately an angle on the bridge—

"Q. Do not go into angles. Please state if the Buick was setting diagonally across the bridge or not? A. It was setting diagonally across the bridge.

"Q. The front end of the Buick, was it closer to the downstream or upstream side of the bridge? A. The front end of the Buick was closer to the downstream side of the bridge. The rear end of the Buick was closer to the upstream side of the bridge.

"Q. How close was the front end of the Buick to the downstream side of the bridge? A. Something like 5 or 6 feet.

"Q. How do you know? A. Because if measured the post that it struck at an instant when we—

"Q. Don't go into that. * * *

"Q. Did you help push the front end of the Buick around? A. I did.

"Q. In what direction was it pushed? A. Upstream.

"Q. Why was it pushed in that direction? A. So that we could get the car in there to get my wife.

"Q. Why couldn't the car get in there without pushing the Buick? A. There was no room between the front of the Buick and the downstream side of the bridge.

"Q. Mr. McNabb, state whether or not a car could have passed between the front end of the Buick and the downstream side of the bridge before the Buick was pushed around? A. It did not look to me like it could.

"Q. Who pushed that Buick around, if you remember? A. Very few faces I can remember there that day; there was a crowd of men gathered there, some of them pushed it around—I helped."

The time when defendant made the mark to which he refers and pointed out to his expert was evidently made after the Buick had been moved, and therefore the mark did not indicate, with any certainty, where the two cars had impacted. Defendant's theory that the Buick stood, its front end west and its rear end east, on the bridge at the time of the impact which took place between it and plaintiffs' car, is negatived by a preponderance of the evidence on the subject.

Act No. 296 of 1928 provides, section 5, subsection (a): "Any person driving a vehicle on a highway shall drive the same at a careful and prudent speed not greater than is reasonable and proper, having due regard to the traffic, surface and width of the highway and of any other conditions then existing, and no person shall drive any vehicle upon a highway at such speed as to endanger the life, limb or property of any person.

"(b) Subject to the provision (a) of this section and except in those instances where a lower speed is specified in this Act, it shall be prima facie lawful for the driver of a vehicle to drive at a speed not exceeding the following, but in any case when such speed would be unsafe it shall not be lawful. * * *"

Provisions follow regulating speed at certain places, and conclude by authorizing a speed of 45 miles an hour under all other conditions. Section 9 of the act contains regulations concerning speed on bridges, and provides that notices on the subject are in such cases to be posted on the bridge.

There were no notices on the subject posted at this bridge; consequently the governing legal provisions are those contained in section 5, subsections (a) and (b) above mentioned.

The speed at which defendant's car entered and went forward on the bridge may with reasonable certainty be held to have been unlawful, imprudent, and reckless by inference drawn from the result of its impact with the south side of the bridge after it had turned to that side, in an angling course. Its engine almost surely stopped as a result of the shock the instant of the impact; yet its momentum was such that, while the onward course of its front end was checked, the angle at which it struck was such that its rear end, according to the direct testimony of six witnesses, two of whom were apparently without interest in the result either way, suffered no check, but swung around, striking in its swing the front end of plaintiffs' car, demolishing it and inflicting on Mrs. McNabb the injury she sustained.

The expert testimony offered by defendant to the effect that his car, after striking the south side of the bridge, swung itself to the north side and with its front end facing west and its rear end east, and was struck by plaintiffs' car on its rear end as it slowly rolled backward on the bridge, cannot be accepted as overcoming the direct evidence offered by the plaintiffs as to how the collision took place.

From Ruling Case Law, vol. 2, Subject, Expert and Opinion Evidence, § 7, p. 573, we copy as follows: "An expert may also testify to general scientific facts or doctrines which are pertinent to elucidate the facts in issue, but not to general theories which have only a remote and conjectural application to the facts of the case, nor in contradiction of positive testimony as to the actual facts."

From Jones on Evidence, Subject, Opinions, § 391, p. 492, we copy as follows:

"It has been said of expert testimony, 'It is not desirable in any case where the jury can get along without it and it is only admitted from necessity and then only when it is likely to be of some value.'

"The evidence of experts is of the very lowest order and the most unsatisfactory character. All testimony founded upon opinion merely, is weak and uncertain and should in every case be weighed with great caution. The unsatisfactory character of such evidence is well known," etc.

Defendant contends that plaintiffs saw him coming, his car swerving, on the bridge, strike the south side and swing to the north side in time to have stopped, and should have done so and avoided colliding with his car. The evidence does not support this contention. The preponderance of the testimony on the subject is to the effect that plaintiff reached and entered on the bridge first, but defendant came on it so soon afterwards, the difference in time being hardly more than distinguishable, and driving faster than plaintiff, passed the center of the bridge and then struck the south side of it, by which time plaintiffs were close at hand, coming on the north side of the bridge.

The evidence indicates that plaintiffs were not aware of their danger in time to do anything more than the plaintiff Lee McNabb says he did. The collision appears to have been unavoidable as far as plaintiffs were concerned. The burden to show contributory

negligence is on the defendant. Weiss v. New Orleans Ry. & Light Co., 133 La. 14, 62 So. 216. Defendant further contends that his speed was not excessive; that his car was uncontrollable only because the floor of the bridge was wet and slick as the result of rain; that the condition of the bridge, a fortuitous event, caused his car to swerve and impact with the south side of the bridge, and there would have been no collision between his car and that of the plaintiffs' if it had not been for the condition of the bridge. The burden of proof is upon the defendant to establish this defense. Guidry and Wife v. Teche Transfer Co., 1 La. App. 225 and 227.

The floor of the bridge was wet as the result of rain, making it possibly somewhat slicker than it would have otherwise been, but we are satisfied from the evidence on the subject that the main and principal cause for the swerving angling course of defendant's car after entering on the bridge, and the primary cause for its collision with the south side of the bridge and with plaintiffs' car, was not because the bridge was wet, that was nothing unusual, but to the excessive imprudent and reckless speed at which defendant was driving on the bridge. Such a conclusion is supported by the voluntary admissions of fault in the matter on the part of defendant, made to Mr. NcNabb after they had reached the hospital to which Mrs. McNabb was carried from the bridge, and his subsequent further admissions to the same effect, made by him to two nurses employed there in waiting on her.

The judgment of the lower court holding defendant liable is correct.

Defendant contends that the amount of damage allowed against him in the lower court is excessive. The amount $1,148.55, recovered by Mr. McNabb is not seriously questioned. The expense to which he was put and underwent on account of the injury to his wife and the loss of his car justifies the amount for which he recovered judgment, and will not be disturbed.

Mrs. McNabb recovered judgment for $6,500. Her kneecaps on both knees were badly broken, and she suffered excruciating pain a long time on said account. She has recovered the use of her right knee, but the broken bones in her left knee failed to unite, and she will not have the normal use of that knee again unless she undergoes another very serious operation. And that might not prove successful. She also received a wound on her forehead which has left a scar. The matter has received our consideration. We have concluded that the amount of the judgment in her favor is excessive, and the same will be reduced to $3,500.

For these reasons, the judgment appealed from, in so far as concerns the amount recovered by the plaintiff Lee McNabb, is affirmed. But, in so far as concerns the amount recovered by Mrs. Cecil Smiley McNabb, the judgment is amended, and the amount is reduced to $3,500. As thus amended and corrected, the judgment in her favor is affirmed. The cost of this appeal to be paid by plaintiffs-appellees; that in the lower court to be paid by the defendant and appellant.