## VAN BAAST v. THIBAUT FEED MILLS
### et al.*

## CONGREGATION OF ST. CATHERINE OF SIENNA CATHOLIC CHURCH v. SAME.
### No. 1237.

Court of Appeal of Louisiana. First Circuit.

Dec. 4, 1933.

Spearing & McClendon, of New Orleans, and Walter Lemann, of Donaldsonville, for appellants.

C. C. Weber, of Donaldsonville, and Porteous, Johnson & Humphrey, of New Orleans, for appellees.

MOUTON, Judge.

The two above-entitled suits were consolidated below for trial on the same evidence, will be so disposed of on this appeal, and in which separate decrees will be entered.

The two cases were tried by a jury which brought in a verdict in favor of the Reverend Jos. Van Baast for $20,915.50, the amount claimed by him, and for $179.40, the amount sued for by the Congregation of St. Catherine of Sienna Roman Catholic Church for damage to an automobile.

The damage claimed by the two plaintiffs resulted from a collision which occurred on the highway which runs northward from Napoleonville to Donaldsonville. Father Baast was driving from Donaldsonville, southward, towards Napoleonville, and on the way his Ford car collided with a truck belonging to defendant company.

*Rehearing denied January 22, 1934.

The truck, as Father Baast was approaching it, had stopped on the right side of the highway going towards Napoleonville, the direction in which he was driving. The truck was therefore headed southward.

Elmo Landry, driver of the truck, was carrying a load of feed to the Ida Lou plantation which is situated on the left side of the highway. There is a small bridge that connects the highway on the left going to Napoleonville with a lane going eastward through the plantation.

Father Baast says he did not know that there was a lane there although he had often traveled along that roadway and there is nothing in the evidence to indicate that he had any such knowledge. Not being apprised of the existence of the lane, obviously, Father Baast had no reason to believe that the truck would turn to its left from the right side of the road where it had stopped and was standing as Father Baast drove on to pass it on the left side. He testifies, not knowing that it was going to move, he blew his horn; that when he came closer he heard the motor of the truck running and then blew his horn several times. His testimony is that he was then about 50 or 75 feet from the truck. That he blew his horn several times and at the distance from the truck so stated by him is supported by the testimony of his niece, Mrs. John Heuwel, who was in the auto with him, also three of her small children. Father Baast testifies that as he approached the truck and was about passing to its left, he was traveling at a speed of 30 or 35 miles an hour, to which Mrs. Heuwel, his niece, testifies.

Counsel for defendant company called four or five witnesses to show that Father Baast was a fast and incompetent automobile driver. These witnesses, most all employees of defendant company, in a general way, testified in that direction, one or two saying he had a jerky or peculiar way of starting his auto.

Several witnesses, quite a number of them who had often seen Father Baast driving his car in Donaldsonville and on the highways, others who had had the opportunity of riding with him in his auto at various times, testified that they considered Father Baast a careful and competent driver of an auto.

One of these witnesses said, upon starting his auto he had the habit of going a little faster than perhaps was necessary but laughed, as it is stated in the record, at the idea that this peculiarity could have any effect as to the question of driving a car 30 or 35 miles on the highways.

The evidence taken on this subject, to our minds, indicates that Father Baast is rather a safe than an incompetent or reckless driver. Besides, as it is shown that Father Baast was in no hurry at the time and had with him his niece and three of her small children, one sitting on its mother's lap, we are convinced that he was not traveling at a rate of speed exceeding 30 or 35 miles an hour, as testified to by him and Mrs. Heuwel.

Father Baast says, when he got "close to the front of the truck, the truck turned and hit me," and that he did not see it turn. His auto was struck on the right side, according to his testimony, near the windshield, as well as he could tell.

Mrs. Heuwel also testifies to the fact that the auto was struck on the front side and hence corroborates the plaintiff in his statement that he was struck on the side and near the windshield.

Father Baast and Mrs. Heuwel do not attempt to state the exact spot where the auto was struck and could not be expected to testify with certainty to that fact as the auto was then going at 30 or 35 miles an hour and unexpectedly collided with a truck that was apparently standing still on the side of the roadway and which suddenly turned around to its left.

Father Baast frankly states that he did not slow down as he reached near the truck to pass to the left on his way to Napoleonville.

Counsel for defendant make a great deal of that statement as an important element of their defense, particularly to the answer of Father Baast to the following question propounded to him, viz.: "You did not slow down?" Answer: "He was standing still, why should I slow down after I blew my horn."

This answer, for a proper understanding of Father Baast's testimony, must be taken with what he had previously said on this subject. The prior statement to which we refer is where he said the truck was standing still and that when he got close to the front of the truck it turned and struck his auto. He had blown his horn at 50 or 75 feet from the truck and before, and, several times thereafter, had actually gotten to the truck and almost to its front while it was yet standing still. He therefore had no reason to believe, and was justified in believing, that the truck driver had heard the tooting of his horn and would not grossly violate the fundamental laws of the road by making a sudden and unexpected turn to his left. In the light of these facts nothing detrimental can be drawn against the testimony of Father Baast because he said: "Why should I slow down after I blew my horn." Evidently, the idea he intended to convey was what would be the use of the slackening of his speed when everything indicated that the driver of the truck had heard his horn and would respect the obvious right he had of passing to the left

of the truck where there was ample room for the safe passage of his auto.

It is admitted by Elmo Landry, driver of the truck, that he started across the road "without looking back or putting out his hand." As he did not extend his hand out of the truck on making this turn, Father Baast, not getting this signal and seeing that the truck was standing still by the roadside, after the repeated blowing of his horn, as hereinabove explained, there was nothing which required him to slow down his speed as he proceeded in the direction he was traveling. Not having looked backward through the mirror he had on his truck or otherwise before attempting to turn, it is obvious that Landry did not see the auto until "it struck" his truck, as testified to by him. He says, however, that it was struck on the left side. Landry says he never heard the blowing of the horn by Father Baast, It appears that, when Landry dropped the hitch-hiker, Hebert, from his truck, that he had unintentionally passed beyond the point opposite the lane into which he intended to turn with his truck. He had to back his truck to place it in the proper position to make the turn. It is possible that these unexpected movements diverted his attention temporarily from looking backward through the mirror or otherwise and in this momentary disturbance he failed to perceive what was going on around him and to notice the sound of the horn which had doubtless been blown repeatedly in his rear.

■ Be that as it may, his failure to hear the horn cannot be ascribed to any fault or negligence of Father Baast. As Landry did not hear the horn, did not see plaintiff's auto, and only knew of the collision when the impact occurred, it is evident that he was not an eyewitness as to whether the truck ran into the front side of the auto, as was testified to by Father Baast and Mrs. Heuwel who saw the collision. They both testify that the truck ran into the auto by the effect of which it was turned over near the highway. Landry, not having actually seen the collision, could not, as an eyewitness, testify as to the manner it occurred.

Restricting the analysis of the evidence to the oral testimony, the proof clearly shows that the truck ran into the auto, as was shown by the evidence of Father Baast and Mrs. Heuwel, eyewitnesses.

With a view of overcoming this testimonial proof, counsel for defendant refer to the physical facts of the case.

The record shows that the fly wheel, radius rod, and chassis of the auto were broken, and, according to defendant's witnesses, that such a result was impossible, unless the front of the auto had struck the truck. It is testified to by several witnesses for plaintiff that this damage could have result-ed from the turning over of the auto, while other witnesses for defendant take the opposite view. This contradictory opinion evidence cannot be accepted as overcoming the testimonial proof to which we have referred. It is shown also, as part of the physical facts, that immediately after the accident, the truck was found at several feet from the bridge that leads into Ida Lou plantation, while the auto was lying in the field northward from the truck, that is, in the direction of Donaldsonville, the way opposite to Napoleonville. It is claimed by defendant that the truck was much heavier than the auto, and, hence, it had been struck on the side and shoved towards Napoleonville. It may be that the truck, when it struck the auto, was going towards the bridge, diagonally, and was slightly diverted from its course, sliding under the force of the auto (then traveling at 30 or 35 miles an hour) along the ditch on the side of the highway to the spot where it stopped after the collision.

It is claimed by defendant that the truck was struck on the side. This truck, with the feed in it, weighed four or five thousand pounds. The auto, a Ford, is known to be one of the lightest cars on the market. The proof shows that Father Baast was sitting on the front seat driving, with the little boy of Mrs. Heuwel to his right, while she was holding a little child on her lap.

These little children and their mother suffered no injury whatsoever from the effects of the collision, not a scratch as far as is disclosed by this record. It is impossible to believe, seated as they were in the auto, that they would have escaped completely from harm if the auto had run head-on into the side of that heavy truck. If the collision had occurred in that way, we are compelled to believe that the boy on the front seat would have been severely injured, if not killed; and that the auto would have been smashed at the rate it was going, injuring Mrs. Heuwel and the other children.

■ This analysis of the evidence brings out the probabilities of results which lead to the inference that the collision did not occur by the auto running against the side of the truck and shows the danger of accepting the logic of physical facts as the final arbiter in the solution of contested issues, as are herein presented. Of course, when the testimonial proof is irreconcilably in conflict, physical facts are considered as the only means for the decision of the case. Here, the oral evidence showing what occurred when the auto and truck collided is not in conflict, but is rather one-sided and shows from the testimony of plaintiff and his niece that the truck ran into the auto turning it over into a field adjoining the highway. Conceding, however, that it was

the auto that ran into the truck, the legal results would not be changed in fixing the responsibility for this accident.

Section 19 of Act No. 296 of 1928, which provides for the signal which a vehicle, situated as was the truck in the instant case, should give, says that:

"The driver shall indicate his intention to start, stop, or turn by extending the hand and arm horizontally from and beyond the left side of the vehicle."

It is admitted by Landry that he gave no such signal when he made the turn to his left, had not seen plaintiff's auto, and realized that there was a collision only when the crash actually occurred. Landry was therefore guilty of gross negligence in thus violating the statute regulating traffic on the highways, the custom or law of the road which preceded the enactment of that statute, and the dictates of common care and prudence demanded in such situations.

On the other hand, it is clearly shown that Father Baast, as he approached the truck, gave all the warning that could be expected of him and had the perfect right of passing alongside of the truck at the rate of speed he was going. The proximate cause of the accident was therefore due to the sudden, unexpected, and unwarrantable turn in the highway made by Landry, driver of the truck for defendant company.

■ Mention is made by defendant of the doctrine of the last clear chance.

It is evident from the evidence, as hereinabove commented upon, that Father Baast was next to the truck when he first noticed it was turning to its left and in front of his auto. As such was the situation immediately before the collision, it is manifest that the rule of the last clear chance invoked by defendant has no application herein.

Defendant was correctly held liable in damages and the only question remaining for consideration is as to the amount that should be allowed.

■ Father Baast suffered a comminuted fracture of the knee cap of the right leg. The knee cap is about the size of a dollar and was broken into small pieces. A piece of bone stuck out of the knee and the remaining bone had to be drilled into by Dr. Nix, an eminent surgeon of New Orleans. He remained in the Hotel Dieu, New Orleans, thirty days; and was confined to his home during seventy days. His right leg from the ankle to the thigh was placed in a plaster cast and during the heat of the summer season he underwent a major operation as stated by Dr. Nix. No doubt Father Baast, as he testifies, suffered intense pain, particularly before the operation and immediately thereafter.

He testifies he was a helpless cripple during the seventy days of his confinement at home, which made up a hundred days, counting the time he was in the hospital, that he was in that condition. He explains that during that period of time he could not say mass and had to get Father Chambon to attend to these functions and to go around his parish as his substitute. Two years after the accident, when the case was tried, he was still limping, could not walk from his house to the post office, a distance of about four blocks and prior to the accident, his testimony is, he walked miles at a time. He said he did not believe that he could hereafter go around his parish to perform his priestly duties as it had been his custom.

It was shown that co-ordination in the movement of the leg was impaired, which caused a considerable limitation in its motion. Dr. Folse, who attended to the plaintiff after his return from the hospital, speaking of this lack of co-ordinated movement, in his leg, testified that it was "distinctly possible" for that condition to remain permanent. It is true that Dr. Nix said that he thought when Father Baast was discharged from the hospital that with proper manipulation of his leg he would regain almost the normal function of the injured "joint."

In answer, however, to the question as to whether it was reasonable to assume that plaintiff would suffer pain from the injury in after life, Dr. Nix said, "Some people suffer from such injuries throughout life." He also stated on this subject that a comminuted fracture of the knee cap no doubt could cause "trouble in later life."

It is true when Father Baast was discharged from the hospital that Dr. Nix thought he might regain the normal flexion of his knee joint. The operation had been successful and evidently the surgeon thought, and no doubt hoped, the normal movement of the joint would be restored. It was not, however, regained, as the evidence shows at the time of the trial the leg was bent to about fifteen or twenty degrees, that plaintiff was still limping two years after the accident, could not walk a distance of four blocks, could hardly kneel, and was thus suffering from a serious impediment while pursuing his vocational functions. As was stated by Dr. Folse, "Nature alone and time will tell."

Counsel for defendant company refer to the case of McNabb v. Dugas, 142 So. 174, decided by this court, where it was shown that both knee caps had been badly broken; that she had recovered the use of one knee but not the other, where the knee had failed to unite and which would have required an operation for its restoration to normal use. In that case, one knee only had failed to unite and

which could not be brought back to its former use without the aid of an operation. In that case, the damages allowed were reduced by this court from $6,500 to the sum of $3,500.

In the instant case, plaintiff has also suffered an injury to one knee which has not been restored to its normal function, a condition which may remain permanent and bring about trouble in later life, as was shown by the medical experts who testified in the case.

Father Baast was unquestionably a vigorous man when he was injured, was then 53 and had a life expectancy of about 18 years. This injury, which will probably be permanent, and which, if it so proves as it was indicated by the condition of his knee at the time of the trial, will continue for the rest of his life to be a serious impediment to the discharge of his ministerial duties while officiating as a priest and on his visits to his parishioners at other times. Hence, he will be seriously handicapped in the performance of his vocational functions and other priestly duties. Consideration of these facts which required him to incur financial obligations must enter as an element of damages in this case which was not present in the case of McNabb v. Dugas, above referred to.

That case, it will also be noted, was handed down in June, 1932, at the time the financial depression was at its lowest ebb and of which the courts, in assessing damages, had taken judicial notice in several adjudications.

█ We have now a new deal and from all indications there appears to be a rise in the price of commodities and a corresponding decrease in the value of the dollar, and of that fact the court must likewise take judicial notice, a privilege exercised by us in a very recent case.

Obviously, the amount of damages of $20,-915 allowed by the jury in this case is exorbitant and is so recognized by counsel for plaintiff who are asking judgment for $12,000. This amount would also be excessive.

We think that $2,500 for damages and $915 for expenses incurred by plaintiff with legal interest will be a just award in favor of plaintiff; also $179.40 for the claim of the congregation of St. Catherine of Sienna Roman Catholic Church for the damage to its automobile, with like interest, which will be given to the church in a separate decree.

It is therefore ordered, adjudged, and decreed that the verdict of the jury and the judgment therein rendered herein for plaintiff against defendant in the sum of $20,915 be and is hereby reduced to the sum of $3,415, and that plaintiff have judgment against defendant in the latter stated sum with legal interest thereon from judicial demand; and, as thus amended, the judgment appealed from be affirmed. Appellee to pay the cost of this appeal, all other cost by defendant.