Between 7:00 o'clock and 7:30 o'clock on the evening of Saturday, May 13, 1939, Robert H. Smith, one of the defendants in this case, left Baton Rouge in his Chrysler Sedan, accompanied by a Mrs. Foltz, who is also referred to as Mrs. Craft, with the intention of playing Beano at one of the night clubs in Hope Villa in Ascension Parish. Not finding many cars parked there upon his arrival, he continued in the direction of New Orleans on the Jefferson Highway, now commonly referred to as the Airline Highway, without any particular destination but with the thought that he might drive over the Huey P. Long Bridge near New Orleans. Mr. Smith, an employee of the Bethlehem Steel Company, had been in Baton Rouge only two months and had never before driven in the vicinity of the bridge.
At about the same time that Mr. Smith left Baton Rouge, six negroes left New Orleans in a Dodge Sedan, owned by Nicholas January, one of the plaintiffs, and driven by James Vaughn. In addition to the owner and driver there were in the car Lillie Delaney, January's mother, Jessie Clark, his aunt, Cal Prevost, and Clarence Jefferson, all four of whom are also plaintiffs. Their destination was Lemoine, Louisiana, where they were to visit January's aunt. *Page 907 
Neither car ever reached its destination. Instead, at about 9:00 o'clock that evening, approximately two miles south of LaPlace, on a perfectly straight portion of the Airline Highway, described as what is commonly known as a twenty-foot paved road, these two cars collided, as a result of someone's negligence in that all important split second when, as so often happens, the human mind and the human machine prove their fallibility and tragedy ensues. In this preventable accident, one life was taken, that of Mrs. Foltz, and six persons, the occupants of the Dodge Sedan, were injured, three more seriously than the others. Both cars were badly damaged.
Nicholas January, Lillie Delaney, Jessie Clark, Cal Prevost and Clarence Jefferson brought suit in the Nineteenth Judicial District Court, Parish of East Baton Rouge, against Mr. Smith and his insurer, General Accident Fire and Life Assurance Corporation, Ltd., in varying sums. The Board of Administrators of the Charity Hospital of Louisiana at New Orleans intervened in three of the cases, praying for judgment against both the plaintiff and the defendants in each case for hospital treatment, drugs, medicines and X-Rays furnished to the respective plaintiffs. Without agreeing with all the views expressed by the trial judge, we approve his conclusion that the defendant, Robert H. Smith, was guilty of negligence, which renders him and his assurer responsible to the injured parties.
This case presents the usual irreconcilable mass of testimony that will be found in the record in almost every accident case. There are the customary interested witnesses, who are actuated, at least in part, by their desire to procure compensation, the seemingly disinterested witnesses, who permit their zeal for the advancement of "their side" to lead them from the straight path of actual occurrences to the more fascinating and interesting by-paths of conjecture, exaggeration and even misrepresentation, and, fortunately, the straightforward witnesses, who merely wish to help the courts to arrive at a correct conclusion. The trial judge heard these witnesses, and he saw each of them testify, for none of the testimony was taken out of court. While we believe that it would do violence to the salutary provision of our basic law, which gives an appellate court the right to review the facts as well as the law, for such a court to accept as binding the findings of the lower court on questions of fact, we affirm the well-recognized principle that where these findings are in accord with the physical facts as presented in the trial court, and where the record does not disclose any substantial errors in the conclusions of the trial judge, these conclusions should carry such weight with the appellate court that it should hesitate to disregard them.
Each plaintiff sued for an exaggerated sum. The trial judge recognized this fact, and awarded judgments as follows:
 Cal Prevost $ 300.00
 Nicholas January 706.25
 Lillie Delaney 2,000.00
 Jessie Clark 3,500.00
 Clarence Jefferson 3,000.00

Not only did the defendants find fault with the decision of the lower court, but three of the plaintiffs, Lillie Delaney, Jessie Clark and Clarence Jefferson, felt aggrieved at the lack of appreciation by that court of the extent of the injuries sustained by them, and filed answers in this court, asking that their respective judgments be increased. Appellants have sought to have these answers stricken out on the ground that they were filed too late, and while this court, for the reasons hereinafter set forth, has concluded that the decision of the lower court should be affirmed with a reduction of $500 in the case of Clarence Jefferson, and a similar reduction in the case of Jessie Clark, we shall dispose of the motions to strike out.
 Motion to Strike Out.
The five suits filed against appellants were consolidated for trial in the lower court and for consideration by this court. The hearing on appeal was fixed by this court for a session of the court, beginning on June 4, 1940. The rules of the court, as amended, provide for a regular session of the court in Baton Rouge during the second week in June. The court, in its discretion, fixed this particular session for the first week in June. Before the expiration of the three days from the beginning of the session, as so fixed, and before the present cases were reached, Judge DORE, a member of the court, became ill, and this court, on its own motion, cancelled the assignment thereof, and fixed June 28th for the argument of the appeals in these cases. *Page 908 
Article 890 of the Code of Practice, as amended by Act 103 of 1908, reads as follows: "890. If the appellee neglect to answer to the appeal within the time allowed him the appellant may have the cause set down for argument, but the appellee shall be allowed to file his answer until the day of argument if he only prays for confirmation of the judgment with costs; but if he demand the reversal of any part, or damages against the appellant he shall file his answer at least three days before that fixed for the argument otherwise it shall not be received provided, that in the courts of appeal for the several circuits of the State such answers shall be allowed filed before argument within the first three days of the actual sittings of any regular session of said courts of appeal."
Rule 11 of this court, printed at page 769 of Volume 11, Louisiana Court of Appeals Reports, stipulates as follows: "Motions to dismiss and answers to appeal shall be filed within the time required by law. Motions to dismiss shall set forth the ground relied upon and may be argued orally or by brief or both."
Inasmuch as the hearing of the present appeal was postponed by action of this court, within the first three days of the session, beginning June 4th, before the actual argument of the appeal was reached, we are of the opinion that a fair and proper interpretation of Article 890 of the Code of Practice and of the rules of this court requires us to hold that the answers were filed in time, and should be considered. We believe that this view is fully borne out by the views expressed by the Supreme Court in the case of Williams' Heirs v. Zengel, 117 La. 599,42 So. 153, 154, from which we quote the following:
"This motion to strike out is the first matter calling for our attention. We find that the case was fixed for argument for the 30th of January, 1906; that six days before that date, namely, on the 24th day of January, the counsel for plaintiffs and appellants wrote to the counsel for defendants and appellees, proposing a reassignment, and that the counsel for defendants and appellees consented, and that on the 30th of January a written memorandum to that effect was executed; that the case was thereupon reassigned for May, 1906; and that the appellees filed the answer in question on March 12, 1906.
"The ground of the motion to strike out is that the answer was filed too late; the Code Prac. art. 890, requiring that the answer to an appeal should be filed at least three days before the day fixed for argument.
"In the case of Des Allemands Lumber Company v. Morgan City Timber Company [ante, 117 La. 1], 41 So. 332, it was held that, where before the expiration of the day for answering the assignment is agreed to be set aside, the time for answering will be computed with reference to the subsequent assignment. The answer was therefore in time, and the motion to strike out must be denied."
While the identical question involved in the present appeal has not been presented in the other two Courts of Appeal, the Court of Appeal for the Second Circuit, in the case of Wilkinson v. Dubach Mill Co., Inc., 2 La.App. 249, specifically recognized the principle that while, under Article 890, as originally enacted, an answer to an appeal had to be filed three days before the day fixed for argument, the amendment effected by Act 103 of 1908 permits this answer to be filed, prior to argument, within the first three days of any session of the court.
The decision of the Court of Appeal for the Parish of Orleans in the case of Succession of Solis, 10 La.App. 109, 119 So. 768, in no way conflicts with the views herein expressed. The court, in that case, held that, unlike the Courts of Appeal of the First and Second Circuits, the Court of Appeal for the Parish of Orleans is required by the constitution to sit in a designated place, namely, New Orleans, and to hold its sessions, "beginning not later than the first Monday of October and ending not sooner than the thirtieth of June of each year." Const. art. 7, § 76. The court, therefore, held that its regular session begins on the first Monday of October of each year, and that, consequently, except perhaps as to cases fixed within the first three days of the session beginning in October, the proviso in the amendatory statute can have no application. The cancellation of an assignment was in no way an issue.
The other cases cited by appellants have no specific bearing on the question involved, in view of the facts that the assignment of the argument in the present instance was cancelled by this court, and that this cancellation was effected, before *Page 909 
argument, within the first three days of the session, fixed for June 4th.
The motion to strike out, accordingly, is denied.
 On the Merits.
As stated in the beginning of this opinion, five of the six occupants of the Dodge Sedan, that is, all except the driver, James Vaughn, filed suits in the Nineteenth Judicial District Court. The record shows that James Vaughn filed his suit in St. John the Baptist Parish, and that it was transferred, on the motion of defendants, to the United States District Court. The briefs filed by counsel for all the litigants, as well as their oral argument, disclosed the fact that the mother of Mrs. Foltz or Mrs. Craft, as the occupant of the Smith car is indiscriminately designated, filed suit against Mr. Smith and his insurer in the United States District Court, based on the death of her daughter, and was awarded a verdict in the sum of $2,000. Each of the five litigants herein presented, in effect, an identical petition, in so far as the cause of the accident is concerned. Each plaintiff contends that the car was being driven in a careful, cautious manner by James Vaughn on his right side of the Airline Highway, that is, the eastern side, and that while it was being so driven it was struck by the Chrysler, driven by Mr. Smith. The acts of negligence imputed to Mr. Smith are set forth in detail as follows:
(a) Robert H. Smith was guilty of gross negligence in operating said Chrysler Sedan automobile prior to and at the time of the accident at the highly excessive and reckless rate of speed of approximately seventy-five (75) miles per hour, which negligence was a proximate cause of the said accident.
(b) Robert H. Smith was guilty of negligence in failing to keep a proper lookout ahead of him and in failing to see the said Dodge Sedan automobile which was rightfully and lawfully on the highway ahead of him and in plain view, which negligence was a proximate cause of the accident.
(c) Robert H. Smith was guilty of negligence in crashing into the left side of the automobile which he was meeting, when said automobile which he crashed into was on its proper side of the road and traveling at a moderate and reasonable rate of speed, which negligence was a proximate cause of the accident.
(d) Robert H. Smith was guilty of negligence in leaving his right side of the highway and in crossing over onto the wrong side of the highway and crashing into the automobile in which petitioner was riding, which negligence was a proximate cause of said accident.
(e) Robert H. Smith was guilty of gross negligence in failing to give to the Dodge Sedan which he was meeting, at least two hundred (200) feet before meeting it, one-half of the main traveled portion of the roadway, all as required by the laws of the State of Louisiana, which negligence was a proximate cause of said accident."
The defendants, naturally, denied any negligence on the part of Mr. Smith. They contended that the accident was due solely and entirely to the negligence of James Vaughn. Their version of the accident is set forth in the following extract from their answers: "That respondent Smith was driving his said Chrysler sedan on the Airline Highway in the direction of New Orleans at a reasonable, careful and lawful rate of speed on the date and at about the time alleged in plaintiff's petition; that he was accompanied by the said Mrs. Christine Foltz Craft, who was seated beside him on the front seat of the said car; that prior to and at the time of the said collision, which occurred at a point about one and one-half or two miles in a southeasterly direction from LaPlace, Louisiana, he was driving the said Chrysler sedan on his right side of the said Airline Highway; that the said Dodge sedan occupied by the plaintiff and six others was approaching the said Smith's Chrysler sedan on the wrong side of the said Airline Highway, that is to say on the left side of the said Highway, in the direction that the said Dodge sedan was headed; that as the two cars neared one another respondent Smith applied the brakes on his car, which brakes worked effectively, in an effort to avoid the impending collision, but was unable to do so and the two cars collided on the said Smith's right side of the said Airline Highway, being the left side of the said Highway for the direction in which the said Dodge sedan was headed."
In addition, defendants charged that Vaughn was driving at a grossly excessive and high rate of speed in a careless, reckless and inattentive manner; that he and *Page 910 
all of the other occupants of the car were intoxicated at the time of the collision; that there were seven persons in the car, which was designed to accommodate only five persons; that it was negligence on the part of each occupant to proceed in such a manner; that the six occupants who were not driving, acquiesced in the operation of the car on the wrong side of the road at an excessive and high rate of speed, in a careless, inattentive and reckless manner, by the driver, whom they knew to be drunk at the time of the collision; and that this acquiescence and knowledge constitute independent negligence on their part, barring them from recovery. In the alternative only, the defendants plead that if the court should find that Smith was guilty of negligence, the actions and knowledge, imputed by them to the several plaintiffs, constituted contributory negligence on their part, barrirg recovery. In addition, the defendants filed a supplemental answer to the petition of Nicholas January, alleging that James Vaughn was driving the car as his agent and servant and that, therefore, all acts of negligence and carelessness of the said Vaughn were attributable and imputable to said January.
The Board of Administrators of the Charity Hospital of Louisiana at New Orleans intervened in three of the cases, under the authority granted to it by special legislative enactment. In the Lillie Delaney case it prayed for judgment against both the plaintiff and the defendants in the sum of $100.50, with legal interest and ten per cent attorney's fees. The amount demanded in the Jessie Clark case was $316, with similar interest and attorney's fees, and in the Clarence Jefferson suit it sought to recover $145, with similar interest and attorney's fees.
Other pleadings were filed which have no bearing upon the issues before this court and, therefore, need not be considered.
The only eye-witnesses to the accident were some of the occupants of the Dodge sedan and Mr. Smith. Out of the mass of conflicting testimony, which, almost of necessity, clutters the record in a case of this type, we conclude that the defendants have sought to prove that the sole cause of the accident was the action of James Vaughn, driver of the Dodge, in cutting suddenly and at a high rate of speed to his left, that is, toward the west side of the road, when he was only between 75 and 125 feet from the Smith car, and in then suddenly cutting back, diagonally, toward the east side of the road in the path of the Smith car, which was unable to avoid striking the Dodge. Mr. Smith's testimony is to the effect that the Dodge car was proceeding on its right side of the road, that he, Smith, was proceeding on his right side of the road, and that the Dodge was driven, without any warning, over to his right side of the road, when there was only a space of from 75 to 125 feet between them, for the purpose, as he believed, of entering a side road, or of going on the grass shoulder on the west side of the road. There was, in actuality, no side road. He further testified that he had not made any effort to bring his car to a stop, when he first saw the Dodge proceeding toward the wrong side of the road, but had merely applied his brakes so as to slow down his car, thinking that the Dodge would continue toward the west and would be off the road before he arrived at the point at which it was crossing. His statement is to the effect that the front end of the Dodge had almost reached the edge of the concrete pavement on the west side, that is, between one and two feet from this edge, when it cut sharply back toward the east, at which time he applied his brakes, but could not bring his car to a stop in time to prevent the collision, which, he contends, took place on his right side of the road, that is, the western side. No testimony was offered to show any reason for such a change in direction. His testimony is further to the effect that he did not deviate from his straight path on his right side of the road, and that he made no effort to cut around the car. He stated that he was driving with his dim lights on and had been so driving since he first turned them on in Baton Rouge. He further testified that he had not been affected by the lights of the Dodge except momentarily when the Dodge cut over to its left and then switched back to its right.
Our analysis of the testimony offered by the plaintiffs is that they sought to establish that the Dodge was being driven on its right side of the road, that it did not deviate from its path, that Vaughn, the driver of the car, saw the Chrysler when it was quite a distance away, that he shifted his lights from bright to dim two or three times in order to call the attention of the driver of the approaching car, which was *Page 911 
the Chrysler with which it collided, to the fact that his lights should be dimmed, that the driver of the Chrysler did not respond to the signal, but proceeded as he had been proceeding, and that, when the Chrysler was a short distance from the Dodge, it apparently got off the paved portion of the road on its right, and, in an effort to get back on the paved portion, its driver, Mr. Smith, cut the car too quickly to the left, causing it to run into the Dodge on the east side of the road, that is, on the Dodge's right side of the road.
We cannot accept Mr. Smith's version of what occurred. We are fortified in this position not only by the fact that the trial judge, who heard and saw Mr. Smith testify, considered that his recital was not correct, but by the improbability of the sequence of events, detailed by him, and, above all, by the physical facts, as testified to by Judge George Janvier, of the Court of Appeal for the Parish of Orleans, and Mr. D.E. Durio, two witnesses who sought to enlighten the court, and as shown in and by the photographs offered by both sides. With due recognition of the fact that the seemingly impossible sometimes occurs, we can find no reason whatsoever for the alleged actions of the driver, James Vaughn, as testified to by Mr. Smith, unless Vaughn was drunk, and the testimony leads us to conclude that there is no proof on that score. Dr. Feucht, the local doctor who examined Vaughn, a short while after the accident, testified positively that he was not drunk and that he had not detected the odor of alcohol on him, although his face had been right up against that of Vaughn. In the absence of proof to the contrary, we believe the statement made by Dr. Feucht as well as the statements on this score, made by the other occupants of the car. That Vaughn was not drunk is further indicated by the fact that he had driven all the way from New Orleans without there being any intimation in the record that he had had any trouble prior to the collision.
If there had been any reason for Vaughn to drive over to the western side of the road in the path of the oncoming Chrysler, and if the Chrysler had struck the Dodge while it was headed in a westerly direction, we could very readily understand that Mr. Smith could have been free of guilt, for we have on numerous occasions seen careless drivers make left turns without regard to the fact that they were endangering themselves as well as the occupants of approaching cars. But there was no reason for making an abrupt turn to the west, and, there was less reason for immediately reversing direction when the front of the car was just about a foot and a half from the western edge of the pavement. As a matter of fact, we cannot understand how this could have been accomplished in the brief time and space described by Mr. Smith. As we understand his testimony, the Dodge did not swerve over to the western side — it was cut over to the west as though it was about to be driven into a road on that side. Then, when it was about to reach the western edge, it was cut back diagonally across the road toward the east. To accomplish this, it would have been necessary for the car to be under perfect control, proceeding at a comparatively slow rate of speed, and at least a portion of the car, in being cut acutely across to the east when the front was just a foot and a half from the western edge, would have gone beyond the pavement, and would have gotten on the western shoulder. Yet Mr. Smith testified that the Dodge did not leave the paved portion of the highway, and, further, defendants have naturally tried to negative any suggestion of the careful driving which would have been required to effect the maneuver. If the Chrysler had struck the Dodge in the manner claimed by defendants, under every rule of reason the Dodge would have been overturned or pushed backward along the western lane of the highway, or, at least, would have ended up largely in the western lane, facing predominantly in an easterly and westerly direction. This is particularly true in view of the positive declaration by Mr. Smith that he never left his side of the road, that is, the western side.
The court is fortunate in having before it the testimony of two witnesses, called by the defendants, who sought in every way to give and did give enlightened and fair testimony, Judge Janvier and Mr. Durio, a civil engineer, connected with the United States Fidelity Guaranty Company, who were returning from a fishing trip, and who were proceeding toward New Orleans in a car at a comparatively short distance behind the Chrysler. We cannot express the same favorable opinion about Mr. Head, the driver of this car, also called by the defendants, who was guilty of a fault which is only too frequently *Page 912 
demonstrated in our courts. While he had no real reason for testifying in favor of the defendants, he became more and more the zealous advocate, and ruined the effect of his testimony by making statements that cannot stand up under the application of the searchlight of truth. Being called upon to pass upon his veracity, on the one hand, and that of Judge Janvier and Mr. Durio, on the other, we unhesitatingly decide in favor of the latter.
Judge Janvier and Mr. Durio are in substantial accord with reference to the positions of the two cars after the accident. According to Judge Janvier's testimony (page 242 et seq.) the Dodge was headed northeast, with its right front corner from three and a half to four feet from the right edge of the concrete, looking toward Baton Rouge and its right rear corner about six feet from the same edge. The left front part of the Dodge was about a foot to the right of the center line of the concrete, and the left rear corner was approximately eight to eight and a half feet from the left edge of the concrete, looking toward Baton Rouge. In addition to the diagram (D-2) which he furnished, Judge Janvier further described the position of the Dodge (page 238) as follows: "I would say about two-thirds of the Dodge was across the center line at an angle so that the rear end was eighteen to twenty inches, maybe sixteen inches, maybe twenty-four inches across the line, and, of course, the front was not across the line. The further you got to the rear, the more of it extended across the line."
According to Judge Janvier, the Chrysler was facing towards New Orleans, at a slight angle towards the southeast. The right rear corner of the Chrysler was described by him as being about two and a half to three feet from the edge of the concrete on the River (western) side, and the right front corner about three to four feet from the same edge (page 249). No part of the Chrysler was east of the center stripe, that is, the left side, looking toward New Orleans, except possibly an inch or two (page 238).
Mr. Durio's recollection of the position of the two cars coincides in most features with that of Judge Janvier. He placed the Dodge car at a slightly more acute angle with less of it to the left or western side of the center stripe (see D-4 and page 295), and he was certain that all of the Chrysler was on the western side of the center stripe, that is, the right side, looking toward New Orleans. His estimate varied from a few inches to a foot (see page 296).
Relying, as we do, on these statements by Judge Janvier and Mr. Durio, we cannot accept the defendants' theory of the cause of the accident, based on the physical aspects, and since the logic of the situation and the preponderance of the testimony likewise negative its correctness, we are constrained to hold that the accident did not occur, as claimed by defendants.
We turn now to the plaintiffs' contentions. We are not convinced that the entire Dodge was on its right side of the road, that is, the eastern side, looking toward Baton Rouge, when the accident occurred, but we do believe that it was either on its right side or so near it that the proximate cause of the accident was the negligence or contributing negligence of Mr. Smith.
The cause of the accident, as relied upon by the plaintiffs, appears to us to be both logical and to be borne out by the physical facts. We do not believe that Mr. Smith was deliberately negligent, but we do believe that a temporary lapse of attention on his part set in motion the machinery of unintentional damage and destruction. As we reconstruct the accident, based on the testimony and the offerings, it is our belief that Mr. Smith was proceeding on his right side of the road, when, as described by the witnesses for the plaintiffs, his right wheels left the paved portion of the highway, and in his effort to bring his car too quickly back upon this section, he cut too acutely to his left causing his car to be swerved in a diagonal line towards the center line where it struck the Dodge, driven by James Vaughn. The position of the cars after the accident bears out this conclusion, and, in addition, the photographs indicate clearly that while the front of the Chrysler was terribly damaged, there was a greater amount of destruction at the left front, and the left side of the Dodge, at about the front door, received the full force of the impact. Counsel for defendants, in their brief, take the position that these photographs confirm their views as to the way in which the accident took place. We agree with them that undoubtedly a portion of the front of the Dodge had already passed beyond the point of contact, but this does not alter *Page 913 
the fact that if the Chrysler went off the road, and was cut back into the Dodge as it was proceeding, the left front of the Chrysler was the portion which should have struck the Dodge on the left side.
It is highly probable that the accident did actually take place slightly west of the center stripe. In the statement, which was prepared by Mr. Stuart, an investigator for the Fire Companies Adjustment Bureau, employed to investigate the accident for the defendant insurance company, and which was signed by James Vaughn, the driver, on the third day after the accident while he was confined in the jail at Reserve, there appears the following: "I was driving on a straight road, and I was blinded by glaring lights from approaching cars. I looked and found that my left side wheels were about a foot over the black center line. Seeing this I tried to swerve back to my right side, but could not succeed in getting over the line. There was a car headed in the opposite direction that was very close at the time and the driver of this car swerved to his left and that car then collided with the left side of my car at the middle."
Around the same date, that is, two or three days after the accident (page 351), Vaughn was questioned by Sergeant Francis Moore, of the State Police, at his office at the Huey P. Long Bridge, near New Orleans. Sergeant Moore testified that Vaughn had told him that he had been momentarily blinded by the headlights of an approaching car, had gotten over on his left side of the road, and that he "had attempted to get back on his right side of the highway when he was struck by the car approaching from the opposite direction." The witness was then asked by counsel for defendants whether or not Vaughn was to the right of the center line at the time of the collision. To this he replied (page 352): "He said he was attempting to get back to the right side of the center line. He didn't say whether he was still on the left side when the accident happened or if he had gotten back to his right side of the road, but he said while he was attempting to get back on his side of the road that's when he was struck."
In answer to the next question as to whether or not these were Vaughn's exact words, he replied: "Yes, sir, those are the words he used as near as I can recollect."
This testimony does not alter our view that the cause of the accident was not that Vaughn was slightly over the center stripe, but that the Chrysler was driven into the side of the Dodge when it was cut over too quickly from the western side after having gone off the pavement. Nor does anything in the statement procured by Mr. Stuart change Vaughn's version, except as to whether or not he was on the wrong side of the center stripe. Vaughn's action may constitute negligence which would operate as a bar to an action against the defendants, but since we believe that the record establishes that Mr. Smith was negligent, and that his negligence was the sole or a contributing cause of the accident, Vaughn's negligence, if any, may not be imputed to the plaintiffs, as his relationship seems to have been the result of a mere impromptu and voluntary arrangement with the owner of the car, January, whereby he would go along on this pleasure jaunt and drive the car. Certainly, he was not the agent or employee of any of the other four occupants, for there is nothing in the record even to suggest any arrangement with them, and the record is lacking in any proof of his employment by January. Similarly, in view of our finding that Vaughn was not drunk, we cannot discover any basis for holding that the occupants were guilty of independent negligence in permitting him to drive. The mere fact that the preponderance of evidence is to the effect that there was a bottle or jug of wine in the car does not alter our opinion, even though the weight to be given to their testimony is lessened by their denial of the presence of the wine.
Counsel for defendants have stressed the principle laid down in Watson v. Hightower, La.App., 181 So. 612, to the effect that one driving on his right side of the road, and seeing another vehicle coming from the opposite direction on its left side of the road, has the right to assume that the vehicle coming from the opposite direction will pull to its right and leave half of the road for the driver on the proper side. But there is a greater principle, founded on our concept of man's duty to man, that requires even those entitled to a right of way to endeavor to protect others imperiled by their own negligence. This doctrine is well enunciated in the case of Rottman v. Beverly et al., *Page 914 183 La. 947, 165 So. 153, 156, in the following paragraph:
"But if a plaintiff negligently puts himself in a place of danger and his negligence and danger are actually discovered by the defendant, then there devolves upon the defendant a duty which intervenes or arises subsequent to the negligent acts of the plaintiff, and that duty is to save the plaintiff from the consequences of his negligent acts if he can. The first duty of those who operate engines or motor vehicles is to keep a sharp lookout ahead to discover the presence of those who might be in danger. If they perform that duty and discover that some one is in danger, then a second duty arises, and that is to use every possible available means to avert injury. If the defendant fails to perform that duty, his negligence in that respect is regarded as the proximate and immediate cause of the injury and the negligence of the plaintiff in putting himself in a place of danger, the remote cause. In such cases the last clear chance doctrine applies even though plaintiff's negligence continues up to the accident."
Now, if Vaughn was only slightly over the center stripe of this twenty foot road, Mr. Smith had ample room to pass him. This is particularly true if we are to treat Vaughn's statements, offered by defendants to impeach him, as a whole, for according to both Mr. Stuart and Sergeant Moore, Vaughn stated that he was only about a foot across the center line, and was trying to get back on the right side when he was struck. Assuming then that neither the plaintiffs' nor the defendants' theory is correct, and that the accident happened on a perfectly straight road, slightly on the west side of the center stripe, we would find Mr. Smith guilty of negligence since he owed a duty not to run deliberately into the Vaughn car.
If the Dodge was markedly on the wrong side of the road, then an obligation rested on Mr. Smith to attempt to avoid doing injury to him. We quote again from Rottman v. Beverly, supra, in which the Supreme Court established a rule for the guidance of the courts of this State: "In cases of discovered peril, it is pertinent and material to ascertain whether the defendant could, after discovering plaintiff's peril, have averted the accident by the exercise of due diligence. If he could have averted the accident by the exercise of due diligence and failed to do so, his negligence in that respect is considered the proximate and immediate cause of the injury, and the plaintiff's negligence the remote cause, and the plaintiff may recover although his negligence continued to the instant of the accident. The basis of recovery in such cases is the defendant's superior knowledge of the peril and his ability to avoid the injury. He has the last clear chance. 20 R.C.L. § 116, page 141."
According to Mr. Smith's testimony, he did nothing other than to slow down his car. Testimony was offered by the defendants to show that the Chrysler was going so fast that it could not have been stopped in one hundred twenty-five feet; but the record also shows conclusively that Mr. Smith did not attempt to stop his car. It likewise shows unqualifiedly, according to his own testimony, that he did not attempt to cut around the car, assuming that it was markedly on the wrong side, but continued unswervingly in the same path in which he had been driving. We believe, therefore, that, if the defendants were relying upon this state of facts, Mr. Smith would still be guilty of negligence.
Finally, if we were to accept as correct Mr. Smith's statement that the Dodge unexpectedly started on some unusual maneuver, we still believe that he is answerable for his actions under the discovered peril or last clear chance doctrine. According to his own testimony, when he was still from seventy-five to one hundred twenty-five feet away, he observed that the driver of the Dodge was making a left turn in the middle of the highway. Conceding that the driver of the Dodge had no legal right to make a left turn, and conceding that Mr. Smith was not going more than fifty miles an hour at that moment, he took no further precaution than to slow down his rate of speed to about thirty or thirty-five miles an hour. It is true that he contends that it was only when he was about thirty feet from the Dodge that the driver suddenly swerved back to the right, too late for him to avoid a collision, but had he acted with proper caution, when he was between seventy-five and one hundred twenty-five feet away, either by attempting to bring his car to a stop, or by bringing it under greater control, or by passing around the car, a movement for which he had ample room, the accident would not have occurred. *Page 915 
In short, we believe that even under his version, Mr. Smith had an opportunity to prevent the accident.
The plea of "sudden emergency" may be availed of only when the party pleading it is himself free from fault and has not contributed to the creation of the emergency. Kaough v. Hadley, La.App., 165 So. 748. Mr. Smith contends, in effect, that the emergency was created when he was only thirty feet from the Dodge. It is our opinion that he was called upon to use ordinary care and exercise ordinary discretion when he was between seventy-five and one hundred twenty-five feet away, that is, when he first saw the Dodge making the unexpected turn. By doing nothing whatsoever to terminate the emergency at that time, other than through the reduction of the rate of speed of his car, he made it possible for the second emergency to be created. Under such a state of fact, he is without standing to urge this defense.
Counsel for defendants have cited numerous cases, with the decisions in which we find no fault, but since they have no applicability to the facts as we have found them, no real purpose could be served by discussing them.
We have endeavored to pass upon the various alternative defenses suggested by defendants, but we agree with the trial judge that the preponderance of the evidence, including the testimony, the photographs and the physical facts, establishes that the accident was caused by the Smith automobile striking the Dodge, at or slightly to the west of the center stripe, as a result of the former having swerved too far to its left when it was being driven back upon the paved section of the highway, after it had momentarily gone off upon the western shoulder.
 Quantum of Damages.
We believe that the award in favor of Cal Prevost is not manifestly excessive. He prayed for and was allowed $50 for loss of salary, which loss was amply proved. His left arm was knocked out of place, his left leg was hurt, and while he suffered no permanent injuries, he was unable to work for a period of three weeks. An allowance of $250, in addition to the loss of salary, was awarded him by the trial judge. We affirm this total amount allowed in his favor.
Our views with regard to Cal Prevost apply to the case of Nicholas January. January, the owner of the Dodge, was allowed $206.25, based on the agreed estimate of the damage done to the car or the loss of the car, taking into consideration its salvage value. January's left eye was cut, and he suffered injuries to his left hip and right leg. None of the injuries was permanent, but he testified that his hip was hurting him so much that he could hardly work for about a month. The allowance of $500 for his injuries, pain and suffering, is not manifestly excessive.
The court awarded Lillie Delaney $2,000, which award she has asked be increased to $4,000. We believe that the amount allowed her is fair and it will be neither increased nor decreased. Lillie Delaney was a middle-aged woman when the accident occurred. She had suffered from arthritis for several years prior to the accident. She had also been treated previously for a fractured knee, which had been wired. She had had three jaw teeth extracted before the accident, and, according to Dr. Ficklen's testimony, her teeth were in very bad condition, he finding that the gums were diseased. As a result of the accident, Lillie Delaney suffered a fracture of the fifth rib on the left side, a concussion of the brain, a laceration of the scalp, and the loss of probably six teeth, some, if not all of which, were in all probability diseased before the accident, based on the medical testimony in the record. She was in the Charity Hospital for eighteen or nineteen days. We see no reason to disturb the allowance of $2,000 in her favor.
We consider the allowance in favor of Jessie Clark somewhat excessive. The lower court allowed her $3,500, and she has asked that this be increased to $7,500. She sustained a comminuted fracture of the lower third of the left femur, a dislocation of the second metatarsal bone, with laceration into the joint, and a laceration of the scalp. According to the Charity Hospital report, there was a "slight medial displacement of the distal fragment of the left femur". She also complained of various bruises and contusions. She remained at Charity Hospital approximately thirty-two days, and claimed that even at the time of the trial she was still dependent upon a cane in walking. It appears from the record, however, that in *Page 916 
the court room she walked without a cane, and the lower court expressed the opinion that it was doubtful that the cane was necessary. Dr. Slaughter, who testified in her behalf, was asked whether or not she was able to do work, such as taking care of a household, ironing, cleaning up, cooking and washing. He answered this question in the affirmative, but stated that she would have some pain in doing this work. He further testified that there was a shortening of one leg of one-half inch, and that he thought she would have a permanent limp. Dr. Ficklen and Dr. McVea, who testified in behalf of the defendants, believed that there would be no permanent injury.
We believe that justice will be done to all parties by reducing the judgment in favor of Jessie Clark to $3,000. Such an award is more in keeping with previous allowances of the courts of this state. Attention is particularly called to the case of McNabb v. Dugas, 142 So. 174, in which this court reduced a judgment in favor of Mrs. McNabb from $6,500 to $3,500. In that case, both of Mrs. McNabb's kneecaps were badly broken, she suffered excruciating pain for a long time after the accident, she had not recovered the use of her right knee, the broken bones in her left knee had failed to unite, and medical evidence showed that she would not have the normal use of that knee again unless she underwent another very serious operation, which might not prove successful. She had also received a wound on her forehead which had left a scar.
The award in favor of Clarence Jefferson was $3,000, which we likewise consider somewhat excessive. Jefferson suffered a fractured mandible, lost two teeth, and suffered a number of cuts and bruises. He remained in the Charity Hospital for probably as long as eighteen days. He is still returning to the Charity Hospital for treatment, but, based upon the record of that hospital, offered in evidence by the plaintiff, that the Wasserman test was a strongly positive one, we are convinced that this continuation of treatment is not for the injuries which he sustained in the accident. His testimony, in our opinion, clearly establishes this fact.
He unquestionably has a deformed lower jaw, due to the accident, and cannot open his mouth to the same extent that a normal person can. It is Dr. Ficklen's opinion that this deformity will lessen. He has bad teeth, but it appears that these teeth were in bad condition prior to the accident. We feel that an allowance of $2,500 will do substantial justice, and, therefore, the judgment in his favor will be reduced to the sum of $2,500.
A separate decree will be entered in each case.
 Claims of the Charity Hospital.
The Board of Administrators of Charity Hospital of the State of Louisiana at New Orleans intervened in the suits brought by Jessie Clark, Clarence Jefferson and Lillie Delaney, claiming the following sums for drugs, medicines and X-rays furnished the respective claimants, as follows:
 Jessie Clark $316.00
 Lillie Delaney 100.50
 Clarence Jefferson 145.00

In each case interest at the rate of five per centum per annum from judicial demand until paid and ten per centum additional as attorneys' fees were demanded. Judgment was prayed for in solido against the respective claimants and the defendants.
Attached to each petition of intervention is an itemized statement of the services rendered, and the petitions were verified by the affidavit of Mr. Cyril F. Dumaine, special assistant to the Attorney General, and attorney for the intervenor.
On the trial in the lower court, intervenor, through its said counsel, offered the petition of intervention, the account and the affidavit of Mr. Dumaine in each of the three cases in which interventions had been filed. This was objected to by counsel for defendants on the grounds that "the statement must be proved by competent evidence". We find that Act 289 of the Legislature of 1938 contains the following specific provision: "Section 5. That whenever the pleadings filed on behalf of any Charity Hospital of this State shall be accompanied by an affidavit of any officer of said Hospital or of the attorney designated to represent said Hospital, that the facts as alleged are true to the best of the affiant's knowledge or belief, all of the facts alleged in said pleadings shall be accepted as prima facie true and as constituting a prima facie case, and the burden of proof to establish *Page 917 
anything to the contrary shall rest wholly on the opposing party."
Since the intervenor complied with the requirements of this statute, and since the defendants offered no testimony in contradiction thereof, we find that the claims of the hospital were duly proved.
Attention is called to the fact that while the judgment in favor of the hospital in each case is rendered against the defendants in solido, the judgment in each instance provides that such judgment is to be paid out of the judgment awarded to the plaintiff. The respective plaintiffs so affected have not complained of this provision. In consequence, the judgment of the lower court in favor of the Board of Administrators of the Charity Hospital of Louisiana at New Orleans, in the three cases in which said board intervened, is hereby affirmed. A separate decree will be entered in each case.
For the reasons herein stated it is ordered that the judgment in favor of Cal Prevost, plaintiff in this suit, be and the same is hereby affirmed. Appellants are to pay all costs.
LE BLANC and OTT, JJ., concur in the decree.
DORE, J., not participating.