This is a suit for damages claimed by plaintiff as the result of an accidental injury alleged to have been caused by employees of the defendant, Louisiana Iron Supply Company. The Fidelity 
Casualty Insurance Company of New York, as insurer of Louisiana Iron Supply Company, is joined as a party defendant. There was judgment below rejecting the demands of plaintiff, from which judgment he prosecutes this appeal.
The accident in which plaintiff was injured occurred on October 23, 1942, while plaintiff was on the premises of one Les Seibert, located in the northern part of Caddo Parish. At the time a crew of three negro employees of the defendant, Louisiana Iron 
Supply Company, was engaged in the removal from the premises of a flow-pipe composed of some forty joints, more or less, of 2 1/2" drill pipe. The line, lying upon the surface of the ground, followed a general north and south direction, along a wagon road, or trail, curving perceptibly toward the west near its southern end.
The pipe had been sold by Seibert, as junk, to the defendant supply company, having been purchased by an individual named, or known, as Leon P. Shanleys. On the date of the accident Shanleys had accompanied the pipe crew to the property, and the crew had set to work "breaking out", i.e. disjointing, the pipe. The breaking out process was being performed in what appears to be the orthodox or customary method, with the use of pipe or chain tongs. The joints of pipe, averaging about 20 feet in length, are connected by collars into which the joints of pipe are screwed, and the usual operation of disjointing the pipe is performed by affixing one or more sets of tongs to the line and using other tongs, placed in position on the opposite side of the collar, for the purpose of unscrewing the joint.
Plaintiff had been taken to the property in question in the automobile of Shanleys somewhere about the hour of 11:00 o'clock in the morning. Plaintiff's purpose was to discuss with a Mr. Freeman a matter of business in connection with pulling a well. At the time Freeman was engaged in an operation on an adjoining lease only a few hundred feet from the Seibert property. After talking to Freeman, plaintiff returned to the Seibert property for the purpose of waiting until Mr. Freeman had completed his operation and could resume their discussion of plaintiff's business affairs. While waiting, plaintiff engaged in conversation with Seibert and Shanleys. The three men, together with Seibert's young son, were standing very close to the pipe line, upon which employees of the defendant supply company were working at the time, at a point some 60 to 80 feet to the north. Plaintiff was standing with his back almost squarely to the line of pipe, at a point some 4 to 6 feet from the line, and, consequently, was facing a little north of west. Seibert was facing plaintiff and the line of pipe, and, therefore, was turned a little north of east. The exact positions of Shanleys and the little Seibert boy are not shown by the testimony.
The pipe crew, having succeeded in breaking out some 30 or more joints of pipe, and having reached a position about 3 or 4 joints, i.e., some 60 to 80 feet, north of the group of men, encountered some difficulty *Page 652 
in finding that the joint upon which they were working did not respond to the operation of the tongs. It was decided that it would be necessary to employ some other method, and one of the negroes, Oscar Dawson by name, proceeded to one of the trucks belonging to defendant supply company, which had been parked some distance away. Dawson drove the truck down to the joint of pipe, with which the difficulty had been experienced, and one of his helpers, John Gibson, attached a short length of chain to the end of the pipe. The purpose was to apply the force of the truck by pulling the end of the joint in an effort to straighten the joint and so break it loose from its connection with the remainder of the line, or loosen it to such extent that it would respond to the use of tongs. The chain having been attached, Dawson moved the truck slowly forward until the slack of the chain had been taken up, and then, in "double low" speed, as he expressed it, he began to pull the pipe by means of the force of the forward motion of the truck. The pulling of the truck operated in the nature of the application of pressure upon a lever, causing the line of pipe toward the south to rise from the ground and move toward the west. The action of the pipe was undoubtedly a sort of whipping motion, in all likelihood caused by the westward curve in the line.
Seibert and his little boy, who were facing the pipe line at the time of this operation, saw the movement of the pipe toward them and, by immediately jumping back escaped injury. Plaintiff, however, standing with his back toward the line, being unaware of the operation that was in process, and not in a position to see the movement of the line, was caught utterly by surprise. The pipe struck plaintiff's right leg, throwing his body back and across the line itself in a sort of straddling position, breaking the right leg and causing the injuries of which he complains in this action. It is also established that the pipe actually hit Shanleys and knocked him down, but, apparently without inflicting injury. After the first pull of the truck which caused the accident, and before Dawson, the driver, began another pull, Gibson called to him that he had knocked a man down.
There is no dispute as to the above facts, but there are marked differences, variations and contradictions in the testimony with reference to details surrounding the main incident, which took place as above related.
Before proceeding with a discussion of the disputed facts, we feel it is proper to set forth at this point the propositions upon which plaintiff based his hope for recovery, together with the contentions set up in defense thereto.
The negligence imputed to defendants in plaintiff's allegations embraces two specific propositions. Plaintiff alleges that the employees were negligent in attempting to disjoint the pipe by the use of pressure exerted by the power of the truck, such negligence resulting from the fact that said employees knew, or should have known, that the effect of this operation would be to cause the line to change its position, thereby endangering the plaintiff, who was standing within a few feet of the line. Next, plaintiff claims that defendant's employees were negligent in that they failed to warn petitioner of their intention to perform the operation which resulted in the accident.
The defense is based upon a denial of any actionable negligence on the part of defendant's employees, and, in the alternative, contributory negligence on the part of plaintiff.
Resolution of the questions raised by plaintiff's actions, and the defenses thereto, necessitates findings of fact with respect to the charge of negligence on the part of defendant's employees, and the contributory negligence on the part of plaintiff. Closely related to these questions of fact are questions of law bearing upon the status of plaintiff, the character and degree of negligence on the part of defendant's employees, and the effect of contributory negligence on the part of plaintiff.
We feel there is no question as to the fact that the negligence of defendant's employees, engaged in the removal of the pipe, is definitely and clearly established by the record in this case. The two members of the crew who testified, the third member being unavailable because of the fact that he was in military service at the time of trial, made no attempt to deny the fact that they knew that plaintiff and his companions were in danger. There is no showing that the ordinary operation of breaking out the pipe through the use of tongs was fraught with danger, but it is conclusively established that the change in *Page 653 
the method of operation would involve an element of considerable and immediate danger to those who were standing in the vicinity of the pipe line. Of course, it follows that, recognizing the potential danger, defendant's employees were thereupon chargeable with the duty and responsibility of protecting the bystanders by warning them of the operation in which they were about to engage and the danger connected therewith. It is upon this question of warning that we encounter the greatest difference of opinion and the widest variance in testimony. Plaintiff testified that he did not see the beginning of the operation, i.e. the removal of the truck and the attaching of the chain to the pipe line, and that no warning of any character was given him. Seibert, who showed himself to be an unwilling, and, to some degree, a hostile witness for plaintiff, testified that he heard the negroes discussing the use of the truck, and that he saw the preparation for this operation. In spite of which fact, Seibert testified that he did not move, that he did not call his companions' attention to the operation and the danger which lay therein, and that only because of the fact that he was looking at the pipe and saw it begin to move was he able to jump back in time to avoid injury to himself. Seibert further testified that he heard no warning given by the negroes. Neither Shanleys nor Seibert's young son testified on trial of the case, but the testimony of plaintiff and Seibert shows that the little boy was able to avoid injury by jumping back and taking refuge behind a small tree when the pipe began to move. Shanleys was himself struck by the pipe and knocked to the ground.
The only testimony of the giving of any warning was by the negroes, Dawson and Gibson. The trial Judge, in his written opinion, found that an effort was made to warn the plaintiff. This finding is somewhat qualified in his opinion on application for rehearing, in which he made the following statement:
"Counsel contends that we should disregard the negro witnesses' testimony as unworthy of belief. It is true that there are some contradictions and inconsistencies, but we cannot totally disregard their testimony, especially, when it appears that the giving of a warning at the time the truck was to be moved seems to be in accord with the action of any person who would be similarly situated and performing a like job, but we did not and do not now say, that the warning was heard by any one of the three, Seibert, Carroll or Shanley — we merely recounted what the testimony showed, and concluded that under the law defendant was not negligent."
Notwithstanding his conclusion that a warning was given, the Judge specifically declared that regardless of that fact, and conceding the negligence of defendant's employees, plaintiff was precluded from recovery because of his contributory negligence.
We are convinced that our learned brother of the District Court was in error with regard to the conclusion that a warning was given. Seibert emphatically stated that he heard no warning, and this, in spite of the fact that he claimed to have been paying particular attention to the operations and activities of the crew, even to the extent of having heard the conversation between the employees with reference to the use of the truck, when they were at a distance of about 60 feet. A careful scrutiny of the testimony of Oscar Dawson and John Gibson convinces us that their testimony is absolutely unworthy of belief. The "contradictions and inconsistencies" in their testimony, which are noted by the district Judge in his opinion, are so numerous, so flagrant, so inexplicable, and so irreconcilable as to render their testimony on all points incredible and unacceptable. For these reasons we are forced to the conclusion that no warning was given. This conclusion is further strengthened by the fact that defendant's employees, although testifying that a warning was given, made no attempt whatsoever to assure themselves that the warning had been heard and was being heeded by the several persons whom they knew to be in danger of injury.
It is strenuously urged, on behalf of the defendants, in the event any negligence on the part of their employees has been established, that the contributory negligence on the part of plaintiff bars him from recovery. Specifically, it is argued that plaintiff was contributorily negligent in that he was himself a man of experience and knowledge of the oil and gas business and in the handling and removal of pipe; that he had observed the operations, attendant upon the process of removing the pipe, for several hours; that he had been warned to stand back from the vicinity of the pipe and had neglected such *Page 654 
warning; and that he had no business with the owner of the land or any connection with the work, and, consequently, was an idle bystander who had voluntarily left a place of safety and moved to a position of danger, carelessly exposing himself to said danger.
There is no doubt but that plaintiff was a man of many years experience with reference to oil and gas operations, but it has not been established that in this particular instance he placed himself in a position of danger. The testimony conclusively shows that there is nothing inherently dangerous in the operation of breaking out a pipe line through the use of pipe tongs. Plaintiff's position only became a position of danger when defendant's employees resorted to a dangerous procedure in the attempt to break a particular joint of pipe. Their change in method was unknown to plaintiff. It is true that he could have seen the truck as it was being moved; that he could have seen the chain attached to the end of the pipeline, and if he had seen these things it follows that then he could have and should have recognized the potential existence of danger in the new character of operation to which defendant's employees resorted. But there was no duty upon him which required close observance of the activities of the pipe crew. Apparently none of his companions were impressed with the danger. Shanleys' impression and reactions we do not know, because he did not testify, and Seibert, although observing the operation, and apparently recognizing the danger, did not consider the danger of such degree as to indicate the necessity of changing his position. More than this, Seibert did not, insofar as is disclosed by the record, make any attempt to remove his little boy to a place of safety. It can only be concluded that Seibert was more impressed with the danger at the time he gave his testimony than at the time of the actual occurrence of the accident.
A mental picture of the situation that existed reflects three men, of mature age and experience, engaged in casual conversation, standing within a few feet of a pipeline that is being disjointed. There is nothing in this picture to indicate, nor is there anything in the testimony of the witnesses to show, that this was a place of danger. Further than this, we cannot find that there was anything which took place at the time which, in the natural course, would have served to warn this little group of men that the place in which they stood had become a place of danger.
On the other hand, the two employees of defendant supply company, who testified, admit that they recognized these men to be in danger. It necessarily follows that, under the compulsion of such knowledge, defendant's employees became chargeable with the duty and responsibility, not only of warning those whose safety their operations imperiled, but of determining that the warning had been received and heeded. To proceed with operations fraught with danger was an act of gross negligence and wanton carelessness on the part of defendant's employees. If the mere giving of a warning were the sole duty laid upon operators of vehicles and machines, automobiles and trains might run over pedestrians, observed by the operator to be imperiled, and be relieved from liability by the mere sounding of a horn, whistle or bell. It is well established that such a conclusion is not justified either in law or morals.
It is zealously contended on behalf of defendant that plaintiff was in effect a trespasser, and that, at most, he could be considered to have no higher legal standing than that of a licensee upon the property at the time of the accident. Since this is not an action by a plaintiff against the owner of the premises upon which he sustained the injury, we do not feel that this argument is pertinent. In Scott v. Claiborne Electric Co-operative, Inc., et al., La.App., 13 So.2d 524, this Court, in the opinion of Judge Taliaferro, quoted, with approval, the rule that the real relationship between an injured person and a property owner is not a matter to be inquired into by one whose negligent action has resulted in injury to the plaintiff.
We have been constrained to refer to this particular point only because of the zeal with which it has been urged by distinguished counsel for the defendants. In view of our finding that defendant's employees were guilty of gross negligence and wanton carelessness we do not feel that the status of plaintiff in relation to the owner of the premises is a matter of consequence. Under the circumstances, even if plaintiff be held simply a licensee, defendant is responsible for the acts of his employees which we have characterized as grossly negligent. *Page 655 
We find no merit in the defense of contributory negligence, which has been urged as a bar to plaintiff's right to recover. In the first place, the facts do not sustain the charge of contributory negligence. Secondly, we are impressed with the fact that conceding, arguendo, the existence of contributory negligence, application of the doctrine of the last clear chance or the doctrine of discovered peril would fix liability upon the defendant. The employees of defendant, and only the employees of defendant, recognized the peril in which plaintiff stood; the employees of defendant, and only the employees of defendant, had the power to prevent or to avert the accident. The burden in this case was not upon plaintiff to see what he should have seen and to observe what he should have observed, but rather this burden was upon defendant's employees. These employees were the individuals in charge of the operation of a dangerous instrumentality. They knew the danger of their operations; they perceived the peril of plaintiff, and they did not discharge to any degree, much less to the measure required by law, the duties incumbent upon them to exert every effort to prevent injury to others. This doctrine is definitely and emphatically set forth in Rottman v. Beverly, 183 La. 947, 165 So. 153, 156. We believe the following quotation from the opinion in the above cited case decisively disposes of the issues of negligence and contributory negligence, discovered peril and application of the last clear chance doctrine which have been raised in the instant case:
"In cases of discovered peril, it is pertinent and material to ascertain whether the defendant could, after discovering plaintiff's peril, have averted the accident by the exercise of due diligence. If he could have averted the accident by the exercise of due diligence and failed to do so, his negligence in that respect is considered the proximate and immediate cause of the injury, and the plaintiff's negligence the remote cause, and the plaintiff may recover although his negligence continued to the instant of the accident. The basis of recovery in such cases is the defendant's superior knowledge of the peril and his ability to avoid the injury. He has the last clear chance."
The above doctrine was expanded in the case of Jackson v. Cook, La.App., 181 So. 195.
The rule established in the Rottman case and enlarged in the Jackson case has been repeatedly followed, and we cite only a few of the cases involving this point, as follows: Streetman v. Andress Motor Co., La.App., 189 So. 321; Young v. Thompson, La.App., 189 So. 487; Eggleston v. Louisiana A.R. Co., La.App., 192 So. 774; Prevost v. Smith, La.App., 197 So. 905; Stansbury v. Drillon, La.App., 2 So.2d 662.
Defendant relies upon the case of Dallas v. Crescent Forwarding Transportation Company, La.App., 13 So.2d 113, decided by the Orleans Court, which decision was also referred to in the opinion of the District Judge as authority for his holding. In our minds, the facts in the case before us are entirely different and distinct in almost every particular from the facts of the Dallas case. It was established in the Dallas case that plaintiff knew the danger of his position and was himself guilty of gross negligence and wanton disregard of that danger. In addition, it was shown that the employee of defendant was unaware of plaintiff's presence, and, therefore ignorant of his peril.
Summing up our analysis of the facts developed on trial of the case, and taking into full consideration the legal duties and responsibilities of the parties, we can only conclude that the gross negligence and wanton carelessness of the employees of the defendant, Louisiana Iron Supply Company, was the proximate cause of the accident in which plaintiff sustained injury. We find that plaintiff was not guilty of contributory negligence, but, even though he had been guilty, such fact would not have served to relieve defendants of liability, inasmuch as the last clear chance of averting the accident lay with defendant's employees, and, further, because defendant's employees had recognized and discovered the peril in which plaintiff stood, and made no effort to guard against the inflicting of injury.
Plaintiff alleges that as a result of the negligence of defendant's employees he sustained severe fractures of the bones of the right leg, immediately below the knee, which injuries have produced a permanent deformity. In addition to the leg injury, plaintiff has alleged various injuries to the nerves, muscles and bones of the lower part of his back, and he avers that all of said injuries have resulted in total *Page 656 
and permanent disability to do the character of work in which he engaged prior to the accident.
The record shows that plaintiff has been an oil well driller and tool pusher for some 20 or 25 years, and that his rate of pay when employed was $1 per hour, a day's work comprising 8 to 12 hours.
The character and extent of plaintiff's injuries are set forth in the testimony of Dr. Harwell, radiologist, and Drs. Payne and Bodenheimer. Dr. Harwell described the nature of the injuries in detail, and Drs. Payne and Bodenheimer testified that plaintiff had suffered total and permanent disability.
In addition to the disabilities suffered as the result of the injuries, the testimony of the medical experts for both plaintiff and defendant is conclusive to the effect that plaintiff is a marked diabetic, with a history of syphilis, from which disease there is some indication he is still suffering, and that he is afflicted with arteriosclerosis. There is some disagreement between the medical experts as to the effect of the leg injury, but, on the whole, we are of the opinion that the testimony preponderates in favor of the establishment of a permanent and total disability.
We find considerable difficulty in attempting to arrive at an accurate estimate with regard to fixing the quantum of damages. Plaintiff sued for $23,000, but his counsel, in brief, has expressed the opinion that an award of $14,000 would do justice.
There is no doubt that plaintiff has suffered severe pain, discomfort, inconvenience, and disability as the result of the injury. The testimony and the photographs introduced in evidence demonstrate the fact that the healing of the fracture has left a deformity consisting of an accentuated genu valgum, which, being interpreted in lay language, means "knock-knee". The testimony shows that it is necessary for a driller to operate drilling machinery largely with pressure of his right foot and leg upon the gear pedals, which operations cannot be satisfactorily performed by plaintiff in his present condition. In view of plaintiff's age, and his physical disabilities, we doubt that he could readily find employment in his occupation as a driller.
Unfortunately, there is a marked lack of definite evidence as to plaintiff's earnings over a reasonable period of time preceding the accident, and, for this reason, we are unable to arrive at any exact basis for an award. However, taking all the facts that have been established into consideration, and further recognizing the decreased purchasing power of the dollar under existing economic conditions, we feel that a figure of $8,000 would do substantial justice in compensating plaintiff for the effects of the injuries received and the disabilities consequent thereon.
For the reasons assigned, the judgment appealed from is annulled and reversed, and there is judgment in favor of plaintiff, Mansie F. Carroll, and against the defendants, Louisiana Iron Supply Company, Inc., and Fidelity Casualty Insurance Company of New York, in the full sum of $8,000, together with legal interest thereon from date of judicial demand until paid, and for all costs of both courts.
DREW and TALIAFERRO, JJ., concurring. *Page 729