On August 24th, 1939, James M. Dallas, a laborer in the employ of William Geagan, was injured when he was struck by a bale of high density cotton which was being unloaded by Jerry Baus, an employee of the Crescent Forwarding and Transportation Company, from a cotton trailer of that company at the St. Andrew Street Wharf, one of the public docks on the river front in New Orleans. Dallas was employed as a stacker of lumber and his duties and the work in which his employer was engaged were such as to bring him within the protection of the Louisiana Workmen's Compensation laws. Consequently, the Travelers Insurance Company, the compensation insurance carrier of Geagan, agreed to pay him, during the period of his disability, compensation in accordance with the said Workmen's Compensation Laws.
Dallas, alleging that his injuries were caused by negligence of Baus, an employee of the Crescent Forwarding and Transportation Company, in unloading the cotton without looking to see that no one was dangerously near, and alleging, too, that in unloading it, he was acting within the scope of his employment, and charging also that said Crescent Forwarding and Transportation Company was also negligent in failing to provide the said Baus with adequate assistance, and averring that the General Accident, Fire and Life Assurance Corporation, Ltd., a foreign corporation, is the liability insurance carrier of the said Crescent Forwarding and Transportation Company, brought this suit against the two said corporations, praying for solidary judgment in the sum of $8,900.
The Travelers Insurance Company intervened and alleged that it had been required to pay to the said Dallas compensation amounting to $527.80, and that it had also been required to pay medical expenses in the sum of $163.30, and that it would also be required to make future payments to Dallas amounting to $9.10 per week so long as his disability should continue (not, however, for a period in excess of four hundred weeks), and prayed that it be awarded judgment against the said Crescent *Page 115 
Forwarding and Transportation Company and the said General Accident, Fire and Life Assurance Corporation, Ltd., for $691.10, the amount already paid, and for such additional sums as it might, in future, be required to pay as compensation and for medical expenses, and also praying that it be allowed a reasonable attorney's fee to be fixed by the court.
The Transportation Company and its insurance carrier denied that there had been any negligence on the part of Baus in the unloading of the cotton, or on the part of the employer in failing to provide him with additional help, and they averred, in the alternative, that, should it appear that there was any such negligence, the proximate cause of the accident was the contributory negligence of plaintiff, himself in that he "voluntarily and unnecessarily placed himself in a position of obvious danger" in spite of the fact that he "was an experienced worker, having worked for many years on the wharf and was cognizant of the obvious danger of approaching too close to a truck from which cotton bales were being unloaded."
There was judgment in favor of defendant dismissing both the suit of plaintiff and the intervention, and both plaintiff and intervenor have appealed.
The record shows that the Harrison Line, operators of a line of steamships between New Orleans and other ports, was accumulating cargo for one of its vessels which was expected to sail from New Orleans, and that the Board of Commissioners of the Port of New Orleans, commonly known as "The Dock Board", had assigned to this Line a portion of the St. Andrew Street Wharf which, as we have stated, is one of the public wharfs on the river front at New Orleans operated by the said Dock Board. This wharf is composed of several numbered sections and a passageway running from one end to the other, from which passageway each of the sections may be entered by drays, trucks and other vehicles and by persons having business therein. The sections have no walls or barriers which separate them from one another or from the said passageway but, we gather from the record, that each of them is delimited by the various posts and stanchions which support the roof.
Wm. Koeneke, an employee of the Harrison Line, was the Wharf Clerk whose duty it was to assign the various sections of wharf allotted to that company for the several commodities which were being delivered to the wharf for the steamship. Koeneke had assigned Section 55 for the unloading of cotton and, at the time of the accident, there was in that section a tractor and cotton trailer of Crescent Forwarding and Transportation Company. This trailer had come into that section loaded with high density cotton, and Jerry Baus, an employee of the Transportation Company, was unloading that cotton to the floor of the wharf. The trailer was higher at the front end than at the rear, and the cotton had been placed on the trailer in two tiers. High density cotton bales are sufficiently near to round to permit them to roll down such an incline from front to rear of the trailer if the employee in charge of unloading merely gives a start to each bale.
Baus was unloading the upper tier of cotton and in this upper tier there were at least nine bales. Koeneke was standing on the wharf checking the cotton as it was being unloaded. He was about 10 or 15 feet from the rear of the trailer but not directly behind it, being a few feet on the up river side. In addition to the cotton which Baus was unloading, there were quite a number of other bales which were already on the wharf and which were strewn, more or less at random, on both sides of the trailer; scattered "like matches" as plaintiff described them.
Dallas had been stacking lumber for the same vessel but in another section. He was sent by his employer, Geagan, to locate Koeneke and to ask that there be assigned additional space for lumber.
Dallas, seeing that Koeneke was in Section 55 checking the cotton from the Transportation Company trailer, went to him there. Koeneke told him to wait a few minutes until he could complete the checking of the cotton as it came from the trailer. He stood near Koeneke while Baus unloaded about eight of the bales. In unloading these bales, Baus caught the end of each with his cotton hook and started it to roll to the rear of the truck. Just as each bale started to roll to the rear, Baus gave it a slight pull towards the down river side of the trailer, and this caused it, after striking the wharf, to roll in that direction away from Koeneke and Dallas. The first seven or eight bales had been cut slightly into that direction. But when Baus caught his hook into the bale which caused the injury, the jute bagging tore and he was unable to control it. It *Page 116 
rolled to the rear of the truck, struck the ground and bounced directly towards Dallas. Unfortunately, just at that time Dallas had turned away and was not looking, and the bale struck him causing serious injuries.
Plaintiff and intervenor charge that Baus was negligent in that he was unloading the cotton without looking to see whether there was anyone near who might be struck, and they say that where high density cotton is unloaded as this was being unloaded, it is impossible to tell just where each bale will finally stop; that it bounces around "like a rubber ball", and they contend that because of this tendency, Baus, before starting to roll each bale from the trailer, should have looked around to see whether anyone was within the zone of danger. And Baus admits that he did not do this. In fact, he says that he did not know that Dallas had come into that section of the wharf and that he, Baus, had unloaded all of the bales which had already come from the trailer without discovering Dallas.
It is charged, too, that since such cotton has this tendency to bounce, the Crescent Forwarding and Transportation Company was negligent in not providing more than one employee to unload it, the contention being that had Baus had assistance, each bale could have been controlled upon striking the wharf. Defendants, on the other hand, assert that it is not customary to provide more than one man for such an unloading operation; that there is no danger to other persons since the cotton is unloaded only within the section especially assigned for that purpose; that no other persons have any right to be within that section; and that if any other person has any reason to be nearby, he should keep his eyes on the cotton as it is being unloaded and should not turn his back to it as they say Dallas did.
They maintain that so far as the Crescent Forwarding and Transportation Company was concerned, Dallas was at best a mere licensee in that section and that they, therefore, owed him no duty except not to wantonly injure him after discovering his presence.
Baus was of the opinion that the section had been exclusively turned over to him for the purpose of unloading the cotton for, when asked whether he did not know that there was danger that other persons were "supposed to be able to stand there", he said:
"No sir; there wasn't nobody supposed to be standing there, not if you are unloading; I have a section to myself; there wasn't nobody supposed to be there, nobody supposed to be there but the clerk checking."
But while it is true that Section 55 had been assigned for the unloading of cotton, we are not at all certain that under the circumstances shown here, Dallas can be said to have been merely a licensee. In the first place, that section, though set aside for cotton, was merely a part of the larger area allotted to the Harrison Line and we do not think that it can be said that the section was sufficiently clearly defined or that it had been so exclusively turned over to the Transportation Company as to justify the conclusion that just because Dallas, when he came into it, did not do so on business with the Transportation Company, he was a mere licensee.
But whatever may have been his status as to the Transportation Company, and even if that Company and Baus owed to him a greater duty of care than is due to a mere licensee, still it seems clear that he, himself, was negligent because, while standing in a place which he well knew to be dangerous, he allowed his attention to be diverted and was not looking when the bale bounced the wrong way and struck him. All of the witnesses, even he, himself, stated that that was the customary method of unloading on the public wharves in New Orleans. He said that it was customary in all places except at the Public Cotton Warehouse, and he also said that his own employer, Geagan, furnished assistance when he was handling cotton. But he added that Geagan handled very little, if any, cotton.
Snyder, one of the witnesses placed on the stand by plaintiff and an employee for a private police company, testified as follows:
"Q. Isn't it a fact, Mr. Snyder, you have seen a lot of cotton unloaded during those many years? A. I have.
"Q. Haven't you also seen cotton unloaded by one man? A. I have.
"Q. You have seen a lot of cotton unloaded by one man, many times? A. Yes, I have."
Charlie Winn, another witness who testified on behalf of plaintiff, said:
"Q. Tell me about the way that this cotton was being unloaded, was that the *Page 117 
usual way to unload cotton? A. All I ever seen unloaded was unloaded like that."
Pen Bates, also a witness for plaintiff, said:
"Q. How did he do it, this man? A. This man unloaded the truck like it should be unloaded; he was standing on the ground, on the floor, and pulled the cotton and got it started before it rolled off, it hit another bale, you see, and bounced back."
And he also testified as follows:
"Q. Have you unloaded cotton? A. Yes, sir.
"Q. Do you know how it should be unloaded? A. Yes, sir.
"Q. Was this cotton being unloaded in the regular manner? A. He was unloading it the right way.
"Q. What do you mean, the right way? Is it usual and customary for one man to load and unload cotton? A. One man unloads it, but four men load it and one man got to unload it."
That there is always danger that high density cotton will bounce and strike anyone standing near by and not on the alert was stated by all of those who had had experience in handling it. In fact, Dallas gives this as his reason for believing that it was dangerous to permit it to be unloaded by one man:
"Q. Mr. Dallas, if there is only one man unloading cotton, as was this situation just at the time you came over to talk to Mr. Koeneke, what is liable to happen in your opinion? A. The cotton is liable to get away from him.
"Q. And if the cotton gets away from him, Mr. Dallas, what is apt to happen? A. Liable to hurt someone.
"Q. For what reason? A. Well, it gathers momentum and comes down and from going, hitting on the end and bouncing and hitting on top of other bales, it will bounce like a rubber ball and God knows where they will stop."
Charlie Winn, who, as we have already said, testified on behalf of plaintiff, said:
"A. * * * take a bale of cotton after it is compressed in the country and brought to town and recompressed, it will run like you would, almost, on the floor when you throw it off the truck.
"Q. This was compressed cotton? A. Compressed cotton."
And when asked by his counsel whether anyone who handles cotton doesn't know that, he said: "Yes, sir."
And yet Dallas, who says that he had had several years of experience around these wharves and who knew that there is always danger that high density cotton may bounce and roll in any direction, admits that when this particular bale was being unloaded, he was not looking. He says:
"I didn't see it until after it hit me."
He also says that he noticed that Baus "had thrown cotton on the uptown side of the trailer" which was the side on which he was standing, though he says that there was no cotton in his immediate vicinity. Koeneke was looking, and saw the bale coming towards him, and, of course, had Dallas been looking he, too, could have seen it and would have noticed that it was bouncing toward them.
It is contended by counsel for plaintiff and counsel for intervenor that in spite of this negligence on his part, Dallas should be permitted to recover, and they call to our attention three cases which they say establish the doctrine that where persons in public places are hurt because of the unloading of heavy articles, such as cotton bales, from trucks or trailers, there can be recovery for the injuries sustained. These cases are Mahan v. Everett and Planters' Molasses Company, Ltd., 50 La.Ann. 1162, 23 So. 883; Foster and Glassell Co., Ltd. v. Knight Brothers, 4 La.App. 307; and Serrene v. Dennis Sheen Transfer, Inc., 7 La.App. 684.
In the Mahan case, heavy barrels of molasses were being rolled down skids from a float or wagon and allowed to "run" across the public sidewalk.
"* * * the momentum gained by the heavy barrels * * * was considerable." [50 La.Ann. 1162, 23 So. 884.]
The driver of the wagon "poised a barrel on the skid on its upper end, and then sent it on its downward course * * * at the instant that a pedestrian was stepping opposite the lower end of the skid."
The court held that the driver was negligent "in loosening his hold on it at the instant that a pedestrian was stepping opposite the lower end of the skid."
The plaintiff in that case was obviously not guilty of contributory negligence as he was on a public sidewalk where he had a right to be, and he had every reason to believe *Page 118 
that the driver would not roll a barrel towards him just as he stepped in front of the skid. The situation here is entirely different since the plaintiff knew from experience just how these bales were usually unloaded, and since he saw, as a matter of fact, just how they were being unloaded on that occasion. He should have realized the extreme danger in standing so near without looking.
In the Foster and Glassell case, cotton was being unloaded from a cotton truck and the unloading was being done in a reserved zone where the unloading of cotton was not permitted, and which zone had been set apart for use of employees as a passageway. Just as the injured man walked by the truck, the employee in charge "yelling `Look out' toppled it [the bale] to the ground — all at one time."
Obviously, there was no contributory negligence on the part of the injured person.
In the Serrene case contributory negligence was not pleaded. This court said:
"No plea of contributory negligence has been filed by defendant, consequently plaintiff's negligence, vel non, is not to be considered."
It is said that even if plaintiff was guilty of contributory negligence, nevertheless, defendants are liable because Baus had the last clear chance to avoid the injury. We do not think that the doctrine of last clear chance is applicable. If there was any negligence on the part of Baus, it terminated when the bale of cotton tore away from him and he no longer had an opportunity to control it. But even after that had occurred, plaintiff, Dallas, could have avoided the accident had he, himself, been watchful.
Defendants maintain that Dallas, in going into the zone of danger assumed the risks of such danger as were apparent to him and as, from experience, he knew must exist there.
Counsel for plaintiff and intervenor, on the other hand, maintain that the doctrine of assumption of risk has no application except in a suit by an employee against an employer. Possibly the doctrine of assumption of risk "eo nomine" does apply only in such a suit but the principle which is involved there certainly has application in other situations. If a third person goes into a known zone of danger and is injured by one of the risks about which he has full knowledge, he surely can be said to have assumed the risk of that danger.
In Johnson v. New Orleans Terminal Co., 154 La. 515, 97 So. 795, 796, the court said:
"It appears that at the time of the accident plaintiff was not an employee of the defendant, but defendant's employees were engaged in operating the derrick and in unloading the steel bars from the gondola car. Under the circumstances disclosed by the testimony of all of the witnesses, the danger resulting from the operation of the derrick and the swinging chains was obvious to any one at the scene, and must therefore have been doubly so to an experienced longshoreman.
"The danger being visible and obvious, the failure of the plaintiff to avoid it or to reasonably attempt to do so was such negligence or contributory negligence as will bar recovery. 20 R.C.L. 112; 29 Cyc. 515; Bianchi v. Del Valle, 117 La. 587, 42 So. 148."
Dallas knew all about the risks which were involved, but deliberately went into the danger zone and exposed himself to those risks and did not watch to see what was going on about him. His own contributory negligence bars his recovery.
The judgment appealed from is affirmed at the cost of plaintiff.
Affirmed.