Oda J. Gremillion, a cross-tie inspector employed by the United States Government, sustained physical injuries while he was inspecting cross-ties at the manufacturing and creosoting plant of American Creosote Works, Inc., at Southport, Jefferson Parish, La. In this suit he seeks recovery in damages from the said corporation and its insurer, Liberty Mutual Insurance Company, solidarily.
There was a judgment dismissing plaintiff's suit and he has appealed.
The accident occurred at about 7:30 o'clock on the morning of August 14, 1941. At the time, the creosote plant was preparing wooden cross-ties for the United States Government.
The Government had established certain specifications as to size, shape and density of the ties, and it required that on one side of each tie there should be cut two slots or "daps" of a specified size and depth so that there might be thus furnished a uniform, flat surface for the steel rails which were to be laid thereon. These daps were cut by what is known as an adzing machine composed of two cutting devices, spaced at the proper distance apart so as to cut them on the under side of each tie as it passed over this machine on a continuous conveyor. The ties were not manufactured by the creosote plant but were bought from tie-makers and shipped into the plant in railroad freight cars. The adzing machine was located on the platform or floor of an open railroad car. The car containing the ties was located on another track alongside of and parallel to the track on which was the car on which the adzing machine was located, and on still another track, also alongside and also parallel, there were "tram" cars or large rolling iron baskets into which the "dapped" ties passed and in which they were stacked. In these trams or rolling iron baskets, the ties were then carried into the creosoting cylinder in which they were soaked with creosote under heavy pressure.
Gremillion was assigned to this plant by the United States Government and it was his duty to make certain that the minimum requirements of the contract were met, and it was proper for him to watch each tie as it passed through or over the adzing machines to make certain that the daps were of the proper size and depth. The ties were hewn and not sawed and, therefore, were not of the exact uniform, rectangular dimensions which is found in sawed ties, and, because of this, they did not stack in the tram with absolute uniformity or regularity. Although it is required that they be 8 ft. 6 inches in length, it is conceded that 1 inch more or less did not justify their being classified as defective, and that some of them were thus slightly longer than others.
At the time of the accident, Gremillion was standing on the ground between the track on which the adzing machine was located and that on which the tram was placed, and his back was towards the tram. In the tram were two employees of the creosote plant whose duty it was to stack the *Page 74 
ties as they descended into the tram from the conveyor which had passed them over the knives of the adzing machine.
Each tram has curving sides which extend some 5 feet or so above the ground, and each tram is long enough to contain two stacks of ties laid end to end, parallel with the rails of the track on which the tram rolls. The creosoting cylinder is round and the trams are rolled into it through a door at one end. In order to utilize the entire inside space of the cylinder and to insure efficient creosoting, the tram, as we have said, is made with round sides conforming with the rounded shape of the cylinder and the ties are stacked into the trams with the top of each stack elevated or extended considerably above the sides and rounded so as to slope from the extreme height in the middle towards the sides, so that as each loaded tram is viewed from the end it has a rounded appearance, the lower half or two-thirds of the curve being produced by the rounded sides or arms of the tram, and the upper portion being produced by the rounded top of each stack of ties.
Now as to the occurrence of the accident: The particular tram which was involved in the accident had been placed opposite the conveyor and one stack of ties had been completely loaded into it. Of this stack, as we have said, a part of the upper ties extended above the sides. The tram had then been moved so that the unloaded end of it was opposite the conveyor and other ties had been dropped into that end. When that end had been partially loaded, a tie, coming off the conveyor into that end of the tram, struck the end of one of the top ties of the loaded stack, and this caused that top tie to fall from its position. It struck Gremillion in the back, knocked him to the ground and caused the injuries for which recovery is sought.
Some of the witnesses say that each tie weighs 125 pounds and some estimate the weight as high as 225 pounds.
Plaintiff's petition contains many charges of negligence:
1. That such an accident could have been made impossible had there been inserted a guide or guides along the sides of the conveyor which would have controlled the lateral position of each tie as it left the conveyor;
2. That the two laborers, whose duty it was to stack the ties in the tram, could have prevented such an accident by properly grasping each tie firmly and carefully and by thus preventing it from striking any other tie;
3. That such an accident could have been made impossible had each completed stack of ties been bound with wire as soon as all of the ties in that stack had been loaded into the tram;
4. That such an accident would not be possible were it not for the fact that the ties were stacked in the trams higher than the sides of the trams;
5. That the ties should not have been stacked irregularly but should have been placed in a regular and compact unit;
6. That the accident would not have occurred had the tram been placed properly opposite the conveyor so that the descending ties could not have struck those ties which were already loaded in the other stack; and
7. That this particular accident could have been avoided had plaintiff been warned of the danger or had he been warned by one of the other employees that one of the ties was about to fall on him.
Defendants, denying that there was any negligence, and, in the alternative, averring that if there was any such negligence, the proximate cause of the accident was the contributory negligence of plaintiff, himself, set forth the following charges of contributory negligence of which they allege plaintiff was guilty:
1. That plaintiff, an experienced Government inspector, was familiar with the operation of the plant and that he had been on this particular work for a sufficient time to have acquired full knowledge concerning its dangers and hazards;
2. That plaintiff voluntarily placed himself in a hazardous position which was not required by the work which he was performing but which he should have known was very dangerous;
3. That the employees of the creosote plant warned plaintiff of the danger of his position but that in spite of this he persisted in exposing himself to obvious danger; and
4. That there were many other safe places in which he could have stood and that, therefore, he was negligent in remaining in that dangerous location.
If, on the part of Gremillion, there was negligence without which the accident would not have occurred, then even if in one or more of the particulars charged *Page 75 
there was primary negligence on the part of the creosote company, there can be no recovery. Therefore, even before we look into the question of primary negligence, we have concluded to consider whether plaintiff, himself, did anything which was negligent or whether he exposed himself to an obvious danger in such a way as to justify the conclusion that he acted without the prudence which should have been exhibited by a reasonably prudent person similarly situated.
Let us first consider the contention that plaintiff carelessly failed to heed the warning of an employee of defendant as to the danger of the position which he assumed in making the inspection. All that we think it is necessary to say concerning this is that the evidence does not warrant the conclusion that any such express warning was given. One of defendants' witnesses maintains that he had called to Gremillion two or three times and warned him of the danger of that particular position, and that twice Gremillion had moved away from alongside the loaded tram only to return again into the more dangerous position nearby. Another employee, however, heard only one warning and that seems to have been given at a time when it was too late for Gremillion to take advantage of it. Gremillion denies that any such warning was given. It is argued, however, that even if no such express warning was given, plaintiff should have been fully aware of the danger of the position in which he placed himself and that therefore, in assuming and in remaining in that position he was negligent; since a person who is injured as a result of unnecessarily placing himself in a position of obvious danger is guilty of negligence.
The record shows that the plaintiff, by training and experience was a ship carpenter and, therefore, was familiar, to some extent, with the handling and stacking of lumber, and it is argued from this that he must have known that ties, stacked as these were, constituted a source of danger to persons nearby. Furthermore, it is shown that he had been on that particular job for more than a week, and it is said that necessarily in that time he must have become familiar with the fact that such ties might fall. But it is also shown that during that week or so no other ties had fallen, so far as he knew. And it is shown, too, that often the wires which were sooner or later twisted together around each stack, and which held the top ties together and prevented any of them from falling out, were fixed as soon as each stack was completed. The fact that no other ties had fallen, and the fact that, in order to properly carry out his work, it was necessary that he look at the ties as they came through the adzing machine, we think make it incorrect to say that merely in standing where he did, he was guilty of such negligence as to bar recovery. If, for more than a week, his experience had not disclosed that there was anything dangerous about his position, he cannot be charged with negligence in assuming that position.
The situation was vastly different from that found in Dallas v. Crescent Forwarding Transportation Co., et al., 13 So.2d 113, 116, decided by us on the 26th day of April, 1943, for there the plaintiff knew, as he admitted, that as the bales of cotton fell from the truck to the wharf, they bounced around "like rubber balls". Yet, in spite of this knowledge, he assumed a position dangerously near to the truck and then turned his back to it.
There is some dispute as to whether there were other positions from which he might have seen the cutting of the daps as the ties passed over the knives, and as to whether or not any of these other positions were safer. Even if he might have stood in some other place, if he found this position convenient and if from the facts with which he was familiar, there was not sufficient danger to justify the conclusion that an ordinarily prudent person would not have remained there — then he was not guilty of contributory negligence in remaining there himself. And we have already said that we do not find that such a reasonably prudent person might not have stood just where he stood.
Counsel for defendants cite many cases in which recovery was refused because the injured or deceased workman had placed himself in a position of danger. In each of these cases it was held that either the employee had exposed himself to a known danger, and had thus assumed the risk of accidental injury, or that in some way he was guilty of contributory negligence. But each of these cases is to be distinguished from this one by the fact that in each of them, the very thing which caused the injury had, to the knowledge of the workman, often occurred previously. For instance, in Dallas v. Crescent Forwarding Transportation Co., supra, Dallas, himself, stated that he knew that often, when *Page 76 
one man is unloading high density cotton, "* * * it gathers momentum and comes down and from going, hitting on the end and bouncing and hitting on top of other bales, it will bounce like a rubber ball and God knows where they will stop."
In Johnson v. New Orleans Terminal Co., 154 La. 515, 97 So. 795, 796, a case on which defendants place much reliance, a derrick was unloading steel bars from a gondola car to a truck, and the boom, with heavy chains attached, "swung back and forth from the car to the truck. * * * on the lift of the last load * * * before the boom of the derrick had swung back into place, * * * the plaintiff stepped from a place of safety into the path of the swinging chain, and was struck * * *." These chains had swung back and forth several times and had crossed the path along which plaintiff was attempting to walk, and he had seen them swinging and yet walked right where he knew the chains were swinging.
In Little v. A. Wilbert's Sons' Lumber Shingle Co.,142 La. 122, 76 So. 582, the plaintiff, an old negro man, had bought refuse wood from the Lumber Company for about twenty years, and knew that it was thrown out by an employee to the very place where he took his position, yet he stood in that position. The Court held that he was guilty of contributory negligence. We think the same may be said of each of the other cases cited. The very movement which caused the injury had, to the knowledge of the injured person, been made many times before.
Of course we realize that often though nothing to indicate danger has actually occurred, if the situation or location is obviously so dangerous that a reasonably careful person similarly situated should have realized the danger, and would have guarded against it or would have moved, an injured person cannot recover if he is injured or killed by the occurrence of the very thing that obviously was imminent. But that is not the case here because, as we have said, so far as plaintiff knew, no tie had fallen before that time and we do not think that the danger, that one might fall, was so obvious that a reasonably prudent person would not have stood where plaintiff took his position.
While we are on the subject of the possibility of ties falling from a completed stack, and we have found that so far as plaintiff's previous experience in that work was concerned, there had been no occurrence which might have called to his attention the fact that there was such danger, we notice that so far as the employees and the manager of the plant were concerned, there had been prior occurrences which indicated to them that there was such danger.
Mr. Boylan, the Manager of the plant, gave the following testimony:
"Q. Mr. Boylan, did you ever know of a tie to fall off a loaded stack in the manner this tie did that hit Mr. Gremillion? A. Yes, I have seen them fall off that way before."
And later, the district judge asked him the following question:
"Q. On those occasions when you saw ties fall off, was it because the ties coming into the second stack struck them and knocked them off? A. On occasions, yes."
The record shows that there are various employees nearby when these trams are being loaded and when they are being hauled to the creosoting cylinder, and since the manager knew that ties had previously fallen, it is evident that there is always a possibility that someone may be injured by the falling of one of them. Such an occurrence could be made absolutely impossible by the very simple operation of completing the tying together with the wires of each stack as soon as it is completed. These wires are already in position and are always tied together either immediately after the completing of the stack or before the trams are hauled into the creosoting cylinder. It was suggested to Mr. Boylan, the Manager, that: "It is simply a question when those strands which are already in there is to be twisted?" His answer was: "Yes * * *".
Mr. Boylan was also asked whether the two employees, who have charge of the stacking of the ties, "Couldn't * * * twist that wire together when they are on top of the first stack?" and he answered: "Yes, sir." And when asked: "Is there any reason why those ties cannot be bound together as soon as the stack is completed?" He answered: "No, I suppose they could be bound together."
Further testimony of Mr. Boylan shows how simple this would have been:
"Q. The method is to place two strands of wire in the empty cage and when the stack is completed simply to twist those strands together? A. Yes, sir. *Page 77 
"Q. It is simply a question when those strands which are already in there is to be twisted? A. Yes, sir.
"Q. They can be twisted very readily when the stack is completed? A. Yes, sir."
It is true that Mr. Boylan and other employees of the creosote plant were of the opinion that the principal reason for the tying of the ties was to prevent their floating off the tram during the creosoting process, but it was conceded that in addition to this, the tying of the ties accomplished the very obvious result of preventing any of them falling off and injuring anyone. Since it would have been so simple an operation to tie these wires which were already in place, and since this would have absolutely prevented such an accident, we cannot but conclude that it was negligence on the part of the company to fail to require that these wires be twisted immediately upon the completion of each stack.
The injuries sustained by plaintiff are quite serious. Dr. Ficklen, the surgeon who first took charge of him, says:
"He had a fracture of the left shin bone, in the middle third, and he also had two fractures of the small bone on the outside of the leg. This bone is known as the fibula. * * * there was also a fracture of the internal malleous (malleolus) which is a knoblike projection at the lower end of the shin bone."
Dr. Ficklen stated that this is what the layman might commonly refer to as the ankle bone.
The experience of Gremillion in the two hospitals to which he was taken was quite painful. It was necessary to open up the point at which he was operated on and remove and replace the plate which had been made use of. It was ten months after the accident before he was able to return to light work. It is contended that his injuries are, to some extent, permanent and that there is grave danger that he will be caused serious trouble later on. The record shows that the permanent disability of the ankle is very slight, and the doctors are very frank in stating that so far as the possibility of future trouble is concerned, there is no certainty of this.
Plaintiff prayed for the recovery of actual damages (expenses of doctors' bills and hospitalization) amounting to $1,043.14. He also prayed for more than $30,000 to compensate him for his loss of earnings, physical pain, mental suffering, permanent deformity, etc. In their brief, counsel for plaintiff concede that the recovery should be only $1,043.14 to cover the actual expenses and an additional $1,833.33 to cover loss of wages, and they suggest $5,000 or $6,000, in addition to these items.
Counsel for defendant, though denying that there is any liability, concede that the actual expenses, together with the loss of earnings, total $2,876.47, and they maintain that the recovery should be not more than $5,000 or $6,000, including those actual expenses.
We have given consideration to the various cases cited by counsel for all parties and are of the opinion that plaintiff should be awarded $3,500 in addition to his expenses and loss of earnings.
It is therefore ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed and that there now be judgment in favor of Oda J. Gremillion and against American Creosote Works, Inc., and Liberty Mutual Insurance Company, solidarily, in the sum of $6,376.74, together with all costs.
Reversed.